## Nancy A. Moore *vs.* John Stevenson.

In the act of 1855, which provides that "in every action for an alleged libel the defendant may give proof of intention, and unless the plaintiff shall prove malice in fact, he shall recover nothing but his actual damage proved and specially alleged in the declaration," the term "malice" does not necessarily import malignity or hatred towards the plaintiff, but only that the defendant was actuated by improper and unjustifiable motives in making the publication.

Where a libellous publication is made by a party for the purpose of ministering to his own vanity, or advertising his dexterity and sagacity in the detection of crimes, and so increasing the profits of his business as a detective officer, or for the purpose of ministering to a vitiated public appetite for scandal, not knowing or caring whether the publication is true or false, he is actuated by improper and unjustifiable motives, and his conduct is malicious within the meaning of the act

And a belief that the charge is true, is not enough of itself to excuse the party making the publication, where the circumstances are such as to show an indifference as to its truth or falsity.

Where the plaintiff in an action for a libellous publication in a newspaper charging her with theft, had alleged as special damage, that she had in consequence of the libel been discharged by one W from his employment as a seamstress in a neighboring town; and on the trial she offered evidence that a few days after the publication W had said to her that there were flying reports in the newspapers about her and her sister, and that it would injure his shop to have such girls there, and had thereupon discharged her,—it was held that such evidence was admissible in support of the allegation of special damage, although there was no other evidence, either that W had seen the particular publication in question, or as to what reports and what newspapers he referred to.

Under the statute of 1853, which provides that a married woman, abandoned by her husband, may transact business and sue and be sued as a feme sole, it is sufficient if such married woman has been *in fact* abandoned, and it is of no consequence that such abandonment has been caused by her misconduct.

Where a married woman, left by her husband, had sued as a feme sole, and the defendant offered evidence of her marriage after the suit was brought to another man, for the purpose of explaining the continued absence of her husband, and to show that an absolute abandonment at the time the suit was brought was not to be inferred from such continued absence, it was held that the evidence was inadmissible.

Where a husband has voluntarily left his wife, with an intention to forsake her entirely and never to return to her, he has abandoned her within the meaning of the statute, and the length of time during which the separation continues before she assumes to act as a feme sole, is of no importance except as affording evidence of her husband's intention with regard to his return.

Moore *v.* Stevenson.

ACTION for a libel.  The declaration charged the defendant with having published concerning her, in the Daily Standard, a newspaper of the city of Bridgeport, the following libellous matter: " A girl by the name of Nancy Allen was yesterday morning arrested by officer John and sent back to New Haven for stealing a valuable shawl on Friday last from the family of James H. Jones of New Haven." The declaration averred that the plaintiff was commonly known by the name of Nancy Allen, her present name being Nancy Allen Moore—and that by " officer John " was meant the defendant, who was called by that name.  The declaration alleged as special damage that she had, in consequence of said publication, been discharged by one O. F. Winchester of New Haven from his employment as a seamstress, and had been thereby deprived of her usual and only means of support.  The suit was brought on the 21st day of July, 1855.

The defendant pleaded in abatement that the plaintiff at the time of the commencement of the suit was and still remained married to one John Moore then living in the state of Illinois, and that the said John Moore had not, at the time the cause of action accrued, or at the time of the commencement of the suit, abandoned her.  On this plea an issue was closed to the jury, on the trial of which it was admitted that the plaintiff was, at the time of the commencement of the suit, and long before, the lawful wife of the said John Moore, but she offered evidence to prove, and claimed that in February, 1855, he abandoned her and had continued such abandonment to the time of trial.  The defendant denied that the said John had ever abandoned her and claimed that if he left her at the time she claimed, he was provoked and induced so to leave her by the misconduct of the plaintiff herself, and was justified by such misconduct in making and continuing such separation ; and in support of this claim, he offered the testimony of one Henry Baker to prove that he, Baker, was married to the plaintiff some time in the winter of 1856-7, and had lived with her as her husband since such marriage ; to which evidence the plaintiff objected as irrelevant to the issue, and the court rejected it.

The defendant requested the court to charge the jury that the " abandonment" mentioned in the statute, which would authorize a wife to institute a suit in her own name, must be such a willful desertion of her by her husband as would lay the foundation for a divorce from him on her petition, as for a willful desertion under the statute relating to divorces; and that if the misconduct of the plaintiff herself was the cause of her husband's leaving her, it could not be an abandonment within the meaning of the statute, and the plaintiff could not maintain the suit.*

The court charged the jury on this point, that when the husband has voluntarily left his wife with an intention to forsake her entirely, and never to return to her, and never to resume his marital duties toward her, or to claim his marital rights, he has abandoned her within the meaning of the statute, and she has a right, while such abandonment continues, to sue and maintain her suit, as if she were an unmarried woman, and that the length of time during which the separation had continued before the commencement of the suit, was of no importance, except as it afforded evidence of the husband's intention in regard to his return,—her right to sue as a single woman being complete immediately after such voluntary separation and leaving of her by her husband with intent entirely to forsake her and never to return.

The jury on this issue returned a verdict for the plaintiff. The defendant then pleaded the general issue, with notice of the special matters of defense below stated. On the trial of the cause on this issue, the plaintiff offered in evidence the alleged libel, accompanied with evidence that it was written and sent by the defendant to be published in the " Daily Standard," a newspaper published in the city of Bridgeport, and was published in that paper accordingly. She also offered evidence to prove the declaration of the defendant,

---

* The statute on the subject is as follows—" Whenever any married woman shall have been abandoned by her husband, it shall be lawful for her during the continuance of such abandonment to transact business in her own name, and to sue and be sued in all courts of justice, as though she was single and unmarried."

after the publication, that the statement in the publication was substantially true; also evidence of the declaration or the defendant, both before and after the publication, that the plaintiff had stolen the shawl referred to in the publication.

The plaintiff also offered evidence to prove that, for some time before and up to the time of the publication, she and her sister worked for one Winchester in New Haven, in a shirt factory; that they had not steady employment, but were set at work by him when he had work for them to do; that while she was at work there she boarded with one Jones, in New Haven, and became indebted to him for her board, to secure which he took and detained her clothing, and that she borrowed the shawl in question of a servant in his family to wear home to her father's in Bridgeport on a visit, intending to return to New Haven the next day and continue her employment at Winchester's, but remained at her father's a few days afterwards at his solicitation ; that a few days after the publication in question, she went back to New Haven to go to work again at Winchester's, and went to the factory, and as she was passing the office door Mr. Winchester called her in and told her he could not employ her any more—that there were flying reports in the newspapers about her and her sister, and it would injure his shop to have such girls there if the stories were true—and that he was sorry, as Mrs. Morgan, the superintendent, said she liked the plaintiff and her sister very much ; that she then told her sister what Mr. Winchester had said and they left ; but that Mr. Winchester did not state what the stories were, nor in what papers he saw them. There was no other direct evidence to show why the plaintiff was discharged by Winchester. To the admission of this evidence the defendant objected, on the ground that there was no evidence to go to the jury that Winchester referred to the alleged libellous publication, or had ever seen it, or discharged the plaintiff on account of it. The plaintiff claimed that inasmuch as this special damage was laid in the declaration, thereby giving to the defendant an opportunity to enquire into the truth of the allegation, and as there was no evidence of any other publication in a newspaper re-

garding the plaintiff, the jury would have a right to presume that this was the publication to which Winchester referred, and that the evidence was admissible.    The court admitted the evidence.

It was admitted on the trial that the shawl in question had not been stolen by any one, and that the defendant was not an officer, and had no warrant for the arrest of the plaintiff or any one else.    But the defendant claimed that the publication was made without malice and in the belief that it was substantially true ; and offered evidence to prove that a few days before the publication, Mr. and Mrs. Jones came from New Haven, and represented to him that the plaintiff had stolen the shawl in question, and requested his assistance in procuring it; that believing their representation to be true, he went with them to the house where the plaintiff was, and found her and told her that she had taken or stolen the shawl; that she got the shawl and delivered it to him ; that Mrs. Jones identified it as theirs ; and that he brought it away leaving Mr. and Mrs. Jones at the house with the plaintiff; and that before he left, the plaintiff said she would go back to New Haven with them, and that he supposed she would do so; and that he considered the plaintiff arrested by him, though he admitted that he did not go through with the form of making an arrest, and did not inform the plaintiff that he had any authority and showed no papers, and did not send the plaintiff back, and did not know what she was to do when she got back.    The plaintiff offered evidence to prove that the defendant charged her with having stolen the shawl, and that thereupon she informed him that she had not stolen but had borrowed it ; and that she did not go to New Haven with Mr. and Mrs. Jones, and did not tell them in the defendant's presence that she would go.

The defendant prayed the court to charge the jury that if they should find that the defendant believed the libellous publication to be true, and was not actuated by malice in fact in making it, their verdict should be for him, unless they should find that the plaintiff was turned out of the employment of said Winchester in consequence of the publication,

Moore *v.* Stevenson

and had sustained special damage thereby; that proof of the falsity of the charge contained in the publication was inadmissible to show malice in fact, but that such malice must be shown by other evidence in addition to the fact of such falsity; that proof that the plaintiff worked for said Winchester, in his shirt factory, was not evidence from which the jury could infer that she worked for a compensation, nor the amount of such compensation, and that unless the jury should find that the plaintiff had proved that she had sustained special pecuniary damages in consequence of being turned away by Winchester, of a certain and definite amount, their verdict on this part of the case should be for the defendant.

The court charged the jury in regard to the special damages claimed, that it being admitted that the charge in the publication was false, and that the defendant made it, if the jury should find that the plaintiff was turned out of Winchester's employment by reason of it, she was entitled to recover such sum in damages as the jury from the evidence should find that she had sustained in consequence, calculated upon her loss of time and wages and her trouble and expenses in seeking other employment, and that as to the amount of such loss the jury must decide in the best manner they could from the evidence before them: and in regard to her general damages, that the plaintiff was not entitled to recover anything, unless besides the proof of the publication and its falsity, she had also proved that the defendant was in fact actuated by malicious motives in making it:*—that the term "malice" did not necessarily import malignity, spite or hatred toward the particular individual affected by the act in question, but only that the party doing it was actuated by improper and unjustifiable motives:—that the existence of malice in fact must be found by the jury, but might be proved by any legal evidence, direct or circumstantial, as by proof of threats or other language indicative of ill will, or an intent

---

* The statute of 1855, under which these instructions were given, is as follows: "In every action for alleged libel the defendant may give proof of intention, and unless the plaintiff shall prove malice in fact, he shall recover nothing but his actual damage proved and specially alleged in the declaration."

or a desire to injure, or by conduct evincive of similar feelings or motives, as if after the publication the party manifested entire indifference whether the charge was true or not, or whether the plaintiff had been injured by it or not, or whether the injury was repaired by publicly contradicting the publication or not:—that the intentional publication of a defamatory charge like this, knowing it to be false, would be pregnant evidence from which the jury might properly infer the existence of malice or malicious motive in fact, not because of the falsity of the charge, but because of the publisher's knowledge of its falsity:—that if the defendant knew that the charge in the publication was false, and yet intentionally made it, knowing it was wrong and must be injurious to the plaintiff, he would be justly chargeable with its natural and necessary consequences:—that if he made the publication for the purpose of putting the public upon its guard against the depredations of a thief, his motive was innocent and laudable, but if he made it for the purpose of ministering to his own vanity, or advertising his own dexterity and sagacity in the detection of crimes and the arrest of criminals, and so increasing his own patronage and profits in the business in which he was engaged, or for the purpose of ministering to a vitiated public appetite for scandal, not knowing or caring whether the publication was true or false, he was actuated by improper and unjustifiable motives, and his conduct was malicious in fact:—that the defendant, not being an officer, and having no warrant, and it being agreed that no theft had in fact been committed by any one, had no legal right to arrest the plaintiff, but that his defense did not depend upon the exact truth or legal accuracy of the charges or statements in the publication, but upon the defendant's honest belief of their truth;—and that if the defendant, at the time he made the publication, honestly believed it true, the plaintiff was not entitled to recover anything on account of general damages, unless the defendant was in fact actuated by malicious motives in making the publication.

The jury having returned a verdict for the plaintiff, the defendant moved for a new trial for error in the rulings of the

Moore *v.* Stevenson.

court with regard to the admission of evidence, and in its instructions to the jury.

*Ferry* and *Sturges,* in support of the motion.

1. The evidence that the plaintiff was married to Baker after the commencement of the suit, and lived with him as her husband, was admissible. The plaintiff had introduced evidence to prove an abandonment by Moore and a continuance of that abandonment to the time of trial. If evidence of the continuance of the abandonment was improperly received, yet the defendant had a right to meet it by rebutting evidence. 2 Phill. Ev., (C. & H. 2d ed.) 431. *Riggs* v. *Lindsay,* 7 Cranch, 500. *Grannis* v. *Branden,* 5 Day, 260. But the testimony on both sides was admissible. Whether a separation amounts to abandonment or not depends on the intent. This intent may be shown by a great variety of circumstances occurring before and after, as well as at the time of the separation, and even after a suit brought. *McLeod* v. *Johnston,* Anthon, 16. This doctrine is held in cases of domicil. 2 Phill. Ev., (C. & H. 2nd ed.) 440. *Richmond* v. *Vasselborough,* 5 Greenl., 396. Also in cases of contract. *Grant* v. *Thompson,* 4 Conn., 203. So, too, to repel the presumption of innocence arising from the relation of the parties. *State* v. *Watkins,* 9 Conn., 47. Now Moore may have left the plaintiff with no intention to abandon her, so that when the suit was brought he may have been merely absent with the intention to return, but have been afterwards induced to abandon his intention to return by the misconduct of the plaintiff in adulterously cohabiting with Baker, and therefore, as this misconduct might and naturally would have induced him to continue his absence and make it an abandonment, when otherwise it would have been a mere temporary separation, it was admissible upon the question whether, at the time the suit was brought, the plaintiff was in fact abandoned. Further, this misconduct of the plaintiff was admissible for the purpose of showing that she abandoned him instead of his abandoning her.

2. The charge of the court as to this part of the case was

erroneous. The statute of 1853 could not have intended that the husband should lose his interest in his wife's estate, merely because he did not live with her, when her misconduct was such as to compel him to separate from her. Its object is to protect married women who are wrongfully deserted by their husbands, and it should be so construed as to effect that purpose. *Abbott* v. *Bailey*, 9 Pick., 89. *Gregory* v. *Pierce*, 4 Met., 478.

3. The evidence of the declarations made by Winchester to the plaintiff at the time of discharging her from his employment was inadmissible. There was no evidence that the publication charged upon the defendant was the one to which he referred, but the declarations proved show the contrary. Winchester said there were *reports* in the *newspapers* concerning *her and her sister*. This was one report, in one newspaper, concerning the plaintiff only. *Rutherford* v. *Evans*, 4 C. & P., 74. To make the evidence admissible, it must be presumed that the Standard, a Bridgeport paper, circulated in New Haven, and that Winchester read it and saw in it the article in question. It is a much more reasonable presumption that he saw it in the New Haven papers which had copied it, or that some person who had seen the article in the Standard had informed him of it, on either of which suppositions the evidence would be inadmissible. *Ward* v. *Weeks*, 7 Bing., 211. *Vicars* v. *Wilcocks*, 8 East., 1.

4. The charge of the court as to proof of malice in the defendant was erroneous. By the statute of 1855, the plaintiff can not recover without proof of malice in fact. The definition given in the charge of the malice required by the statute, is that given in the books of constructive malice or malice implied in law. 2 Stark. Ev., 462, 487.

Malice in fact implies that the defendant was actuated by motives of personal ill will towards the plaintiff. *Wright* v. *Woodgate*, 2 Cr. M. & R., 573. *Taylor* v. *Hawkins*, 5 Eng. L. & Eq., 503. *Bromage* v. *Prosser*, 4 B. & C., 247. *Cohen* v. *Morgan*, 6 Dow. & Ry., 8. *Blackburn* v. *Blackburn*, 4 Bing., 395. 2 Saund. Pl. & Ev., 659, 808. If the facts are consistent with a *bona fides*, *bona fides* must be presumed

till the contrary is proved. *Harris* v. *Thompson*, 24 Eng. L. & Eq., 370. *Somerville* v. *Hawkins*, 3 id., 503. *Carpenter* v. *Sheldon*, 5 Sandf., 77.

The object of the statute was to put libels, as to the presumption of malice, on the same ground with privileged communications at common law.

*Dutton* and *Hollister*, contra.

1. The charge on the subject of abandonment was correct. It followed the language and spirit of the statute. The object of the law was to enable a female, who has been abandoned by her husband for any cause, to protect herself and secure her own rights. And it makes no difference for this purpose whether the woman has been guilty of misconduct or not. The statute makes no exception in such case. The fact of abandonment is just as complete whether it be caused by her misconduct or by something else. There was no pretence, however, that the plaintiff had been guilty of any misconduct before the abandonment, and the motion does not show that proof of any such misconduct was offered. And if the defendant claims that the husband was prevented from returning to the plaintiff by the fact of her marriage with Baker, he should have offered some evidence that he knew of the fact. The court will not infer that that fact had such an influence upon him without some evidence that he had knowledge of the fact.

2. The evidence offered regarding the special damage was admissible. The only question is, whether it tended to prove special damage. Its weight was a question for the jury. If entitled at all to their consideration it was admissible. The only objection urged was that there was no reference made in what Winchester said to this particular publication. The answer is, that as it appeared that there was this publication, and as it was not shown that there was any other regarding the plaintiff, the presumption was that this was referred to. A publication in a newspaper is presumed to be known to the public at large. This is the law with regard to notices of dissolutions, probate notices and the like.

3. The charge with regard to the proof of malice was unexceptionable. The construction of the statute of 1855 claimed by the plaintiff cannot be correct. The legislature did not intend to give a new definition of malice, but merely to provide that the malice should be proved by evidence, instead of being presumed from the mere falsity of the publication, as at common law. Malice is always a fact. At common law, where the publication is false, the law *presumes this fact.* Under our statute this presumption is withdrawn and the plaintiff must *prove it.* But the thing, in the one case presumed, in the other proved, is the same thing in itself. The nature of the malice is not affected by the mode by which it is established. And where the malice must be proved, as under our statute, that proof may be made by any evidence that is pertinent,—by the circumstances in which the publication is made, by the very publication itself, by the indifference of the party who has made the publication as to whether it is true or false. It can not be necessary that a special ill will towards the person libelled should exist. A mere recklessness of consequences is sufficient proof of malice towards the party injured. The most corrupt motives may exist, without any special ill will toward the particular person who is the victim of the wrong. The statute can not have intended anything more than to protect those who from proper motives publish that which they believe to be true, but which afterward proves to be false. Any other construction will make the act a disgrace to our statute book.

ELLSWORTH, J. The first question made in the case is upon the ruling of the court, that the testimony of Henry Baker was inadmissible. The parties were at issue upon the question of fact, whether at the time of bringing suit the plaintiff was abandoned by her husband, so that by virtue of the statute of 1853 she could sue alone as a *feme sole.* It seems that on the trial the plaintiff insisted that the abandonment had been continued after the service of the writ down to the time of trial; the materiality of which fact is

not so readily seen, except possibly in its bearing upon the question whether at the time the suit was commenced she had been really abandoned by her husband or he was merely absent. The defendant insisted that the plaintiff had not been abandoned; that although her husband left her in February, 1855, and had ever since continued absent, it was a separation for good cause; that she had so conducted as to excuse and justify her husband in leaving her society and his home. Whether there was good cause for his leaving her is unimportant as we view the case. The true question is as to the state of the fact,—was she abandoned, either with or without cause, within the true meaning of the word " abandoned " as used in the statute and as explained by the court in the charge to the jury; that is, in the language of the court below, " had the husband voluntarily left the wife with an intention to forsake her entirely and never to return to her and never to resume his marital duties toward her or to claim his marital rights." If he had, it obviously could avail nothing to prove that there was a sufficient cause for it, such as the adultery of the wife, or the like. Indeed, proving that there was cause for abandonment seems to prove that the absence of the husband was, rather than that it was not, an abandonment in fact.

But if the object was to show what was the character of the husband's absence, that it was separation or absence merely, and not abandonment, then we think the testimony was properly ruled out, because it had no tendency to prove the fact for which it was offered; its tendency was to prove the reverse if anything, for it proves only that the plaintiff was married to Baker in the winter following the separation, which certainly does not tend to prove that her husband had not abandoned her. Her marrying another man tends to prove rather that he had abandoned her. Besides, it does not appear that Moore knew of this second marriage, nor that he was where he could have heard of it or have been influenced by it to continue his absence. He went to California in February, 1855, and has not been heard of since, as the motion shows. Unaccompanied with other proof there is

not the least evidence that the second marriage was the cause of his remaining absent from his former home; if it had been the cause, some little evidence of the fact could have been produced on the trial.

The next objection is, that the judge omitted to charge the jury what constitutes an abandonment within the meaning of the law. We think this is not so. He did charge them, as we conceive, fully and correctly on the point.

Nor is there any force in the further objection, that the special damage alleged in the writ as arising from the dismissal of the plaintiff from the service of Mr. Winchester, is not sufficiently traced to the libel published in the Bridgeport Standard to be submitted to the consideration of the jury. There is reason to believe that some one had shown Mr. Winchester this paper, or read it to him, if indeed he did not take it himself. Besides, this objection comes with a very bad grace from the defendant, who did not hesitate to make use of this newspaper to give publicity to the charge against the plaintiff. The libel having been made public in this manner by the defendant, the jury had a right to presume that this very paper was seen and read by Mr. Winchester, especially as no attempt was made by the defendant, either on cross-examination or otherwise, to show that the libel had appeared in any other paper.

But, if we may believe that the defendant's counsel are serious in their claims, a more important question remains to be considered, which is as to the proper import and effect of this statute of 1855. It evidently introduces into our courts a novel if not a singular principle of the law of libel, novel here and novel elsewhere, so far as we are acquainted with the books; and we are now called upon to give it its proper construction.

Its language is " that in every action for an alleged libel, the defendant may give proof of intention; and unless the plaintiff shall prove malice in fact, he shall recover nothing but his actual damage proved and specially alleged in the declaration." The defendant claims that the statute is to be so construed as to justify any and every publication, whether

in a newspaper, letter, circular, advertisement or other writing, however false and generally injurious, if the author or writer believes what he says, and the plaintiff can not prove actual malice as distinguished from legal malice, (i. e., such malice as is inferred from the libel being untrue,)—or, in other words, unless the plaintiff can prove personal pique, ill will and hatred on the part of the defendant towards the plaintiff. To this broad claim we can not give our assent. It would introduce into our courts a doctrine too broad and licentious for that protection of and indemnity to character which is guarantied by the principles of the social compact and the constitution itself. It does not at all harmonize with the general law which secures to every man his good name and fame against the shafts of the credulous, the incautious, the mercenary or the cunning, however the plea of ignorance and innocence may be urged to the contrary, as well as against the malicious and unscrupulous defamer and libeler. By the constitution, " all courts are to be open to grant redress for every injury to the person, property, or reputation, without denial or delay; " and further, " every citizen may freely write and publish his sentiments, being responsible for the abuse of that liberty." It is not possible that the legislature has said by the statute of 1855, that we are hereafter to hold our good names, (more important than our estates,) at the caprice or credulity of other people, or on the mere belief of any one who through prejudice is blind to the truth or through rivalry in business is jealous and inimical and ready to take up an evil report against us. Besides, where there really is no such belief, how can it be made out by proof against the positive oath of the libeler himself? If such is to become the law of libels, if belief is to be enough to excuse the aggressor, we are about to introduce a new era into this branch of the law,—one, we must think, that was never contemplated by the legislature, and one that is characterized by a violation both of the common right of every citizen to the protection of his good name, and of the provisions of the constitution with regard to libels.

Our opinion is that the law was designed to protect hon-

est and careful newspaper editors; but its language does not confine it to them ; it embraces every species of writing that is published. Now, as to such editors, while it is true they were liable to be sued for publishing of any one what was false, though done without malice in fact, they were not practically great sufferers thereby, for, if really honest and careful, they had it in their power to shield themselves from any great injury; whereas, if belief is a sure immunity for whatever is published, a much wider door is opened for the infliction of injury upon the other party. But the law is passed, and so far as it is constitutional, though incautiously worded, we must be governed by it, and this we mean to be in adopting the construction put upon it by the court below.

As we have intimated, the law of libel was well enough as it stood before, and since it. is a subject of peculiar difficulty and delicacy for legislation, it should be let alone, unless the evil suffered is very great, and that evil is susceptible of a certain and equitable remedy. Hitherto the constitution and the law have wisely left every man to publish freely his sentiments, being responsible for what is false and injurious.

We have said we approve of the views expressed by the court below upon the true meaning of the statute. In the charge it is said that a false publication is not of course libellous, as it was before the statute, except in certain privileged communications, but that there must be evidence that the person making an untrue publication is actuated by improper and unjustifiable motives, and that this view will satisfy the words of the statute without there being malignity, spite, or hatred towards the particular person injured. The court held that the jury must be satisfied that the publication was induced by improper and unjustifiable motives, and that this fact might be proved by any proper evidence, direct or circumstantial, such as threats or other language indicative of ill will or an intent or desire to injure, or by conduct evincive of similar feelings or motives, as if the publication was at the time known to be false, or made without authority, or such authority as would be regarded

as entitled to credence among upright and careful men, or manifesting an entire indifference whether the charge is true or false and whether the plaintiff is injured or not, or by a neglect to repair the injury by contradicting the publication when it is discovered to be false, and especially after a request to do it.   These and the like circumstances will, with most juries, tend to prove those unjustifiable and wicked motives which we think will satisfy the intention and the enactment of the legislature.   This construction of the law will protect honest and careful editors of newspapers in publishing or republishing advertisements put forth to caution the public against the depredations of a reputed thief, or the annunciation of a great crime reported by those in the neighborhood who have means of knowledge or which has received general credence throughout the community.   So much may be necessary and perhaps politic and wise, considering that newspapers are looked to as the channels for communicating general and important information; but even here we may demand from an editor, whether he be himself the author, or only opens his columns to others, that he exercise the care and vigilance of a prudent and conscientious man wielding the power of the public press.   Nothing will be gained by too much relaxation of the law of libel.   Substantially this may be said to have been our law hitherto, for the truth has always been held to be a good defense, and common rumor or circumstances evincive of the truth of the libel operate upon the damages by showing that the plaintiff had no character to lose, or that there is no malice in a public organ giving greater publicity to what is already in circulation and generally believed or for which there are strong and convincing circumstances to induce an honest belief.

The present case falls very far short of this, and we can not doubt that the defendant, who, let it be remembered, is not the editor of the paper in which the libel appeared, was influenced by improper motives in making an unwarranted attack on the character of the plaintiff.   He used the press to inflict upon her good name and fame a lasting injury, and

took no pains afterwards to correct the mistake, if such it was, or to counteract the effects of it. It is not pretended that the charge was true, and some portion of it the defendant knew was absolutely false, and yet he gave it wings to pursue her wherever she went, and it can not be doubted this publication caused her the loss of her business and inflicted upon her a very serious and permanent injury. The defendant well knew that he had no process against her, that he had not arrested her for stealing, and never sent her back to New Haven to be tried for theft; nor was there any theft committed so far as appears. Besides, the defendant has no excuse for giving any such publicity to the matter. He is not an editor, and was not called upon to keep the public informed of such occurrences. It is more than possible that the jury believed that he used the press to administer to his vanity, by advertising his dexterity and sagacity in detecting and arresting offenders, to increase his patronage and profits in the discharge of official business, or for the purpose of ministering to a vitiated public appetite for scandal. If it be so, and such conduct could be justified and successfully defended under the law of 1855, that law would be a reproach to the statute book so long as it remained on its pages, and would reflect no credit on the wisdom of the legislature that made it.

We do not advise a new trial.

In this opinion the other judges concurred.

New trial not advised.