DEXTER A. ALLEN vs. PIONEER-PRESS COMPANY.

January 30, 1889.

Constitution—Newspaper Libel Act—Title.—The subject of Laws 1887, c. 191, entitled "An act to regulate actions for libel," is sufficiently expressed in its title.

Same—Act not Partial or Unequal.—The act is not invalid as unequal or partial legislation because its provisions apply only to publishers of newspapers. Laws public in their objects may be confined to a particular class of persons if they be general in their application equally to all of that class, and the distinction made between them and others is founded on some reason of public policy, and is not purely arbitrary.

Same—Constitutional Remedies.—Neither is the act invalid on the ground that it deprives a person of "a certain remedy in the laws," for injuries or wrongs to his reputation, guarantied by section 8, art. 1, of the constitution of the state.

Libel—Constituents of Good Faith.—Mere belief in the truth of the publication is not necessarily enough to constitute "good faith" on part of the publisher; there must have been an absence of negligence as well as improper motives in making the publication. It must have been honestly made in the belief of its truth, and upon reasonable grounds for this belief, after the exercise of such means to verify its truth as would be taken by a man of ordinary prudence under like circumstances. *Held*, *also*, that upon the evidence in this case the question of good faith should have been submitted to the jury.

Action for libel, brought in the district court for Hennepin county. The publication complained of was a newspaper report, (alleged to be wholly false) with conspicuous head-lines, of a public altercation between plaintiff and his wife at a theatre in Minneapolis, at 10.30 o'clock in the evening, at the close of a performance, the altercation being occasioned (as stated in the article) by plaintiff discovering his wife's presence at the theatre in company with another man. The complaint alleges that more than three days before suit brought, the plaintiff served notice on defendant, specifying the statements in the article complained of as false and defamatory.

In its answer the defendant admitted the publication, and also admitted the service of the notice by defendant, and alleged that in the next regular issue of its newspaper, on the day following, "it published a full and fair retraction of all the statements of said article which was complained of as libellous in as conspicuous a place and print and type as was the said article complained of." It sets forth the retraction, which states, among other things, that the parties to the altercation were not plaintiff and his wife and that neither of them was even at the theatre. The answer further alleges that the article was published in good faith, and that its falsity as to plaintiff and his wife was due to a mistake and misapprehension of the facts and of identity of the parties, and that it was published without any malice or ill-will towards plaintiff and his wife.

At the trial before *Young*, J., and a jury, the plaintiff rested his case on the pleadings. The defendant, to prove its good faith, called its reporter who had furnished the article. His testimony was to the effect that about half an hour after midnight he met a young man, who furnished him with the statements contained in the article, from which the witness then wrote the article, adding matters of detail by way of "professional embellishment," and at once telegraphed the whole to defendant's office at St. Paul, where the head-lines were added, and the article was published in the morning. The witness made no attempt to verify from other sources the statements so made to him, being satisfied that his informant "was as good authority as I could have," although he knew plaintiff, and knew him to be a man of good reputation, and "never knew of Mr. Allen being mixed up in

anything of that sort;" and in regard to plaintiff's wife, the witness "knew she was as nice a lady as there was in Minneapolis, as far as I know," and had been acquainted with her for more than a year. The witness further stated that if his informant had not been so well known to him, he would have hesitated and required assurance and reassurance; but he knew that his informant was a man of truth and accuracy, and fully believed his assurances that the story told was true in every particular. The witness also testified that in writing up and at once sending on the report, "the idea I was thinking of was to get it out as rapidly as possible. I had an idea that the other papers would have been 'scooped' the next morning; that the thing had not been circulated much, from the fact that I had not heard it before." The witness would not state that he had not met plaintiff, at the latter's place of business, about 11 o'clock on the evening of the performance, though he thought the chances nine out of ten that he was not there. On the other hand, plaintiff, called in rebuttal as to this last point only, testified that he saw defendant's witness in his (plaintiff's) place of business for a few minutes on the evening in question; that this was "from half past 10 to 11—I could not say positively;" and that they exchanged a few words.

The court directed a verdict for defendant; a new trial was refused, and the plaintiff appealed.

*Miller & Young,* for appellant.

*Flandrau, Squires, & Cutcheon,* for respondent.

MITCHELL, J.[1] The questions raised by this appeal involve—*First,* the validity, and, *second,* the construction, of chapter 191, Laws 1887, entitled "An act to regulate actions for libel." The act is claimed to be unconstitutional on three grounds. The first is that the subject of the act is not expressed in the title, as required by section 27, art. 4, of the constitution. This section has been before this court for construction in so many cases, beginning with *County of Ramsey* v. *Heenan,* 2 Minn. 281, (330, 339,) and ending with *Minn. Loan & Trust Co.* v. *Beebe, supra,* p. 7, (at the present term,) that all that need be said on this point is that all the provisions of the act relate and are germane to the subject expressed in the title, and proper to the full

---

[1] Gilfillan, C. J., not being present at the argument, took no part in this decision.

accomplishment of the object so indicated. *State* v. *Kinsella*, 14 Minn. 395, (524;) *State* v. *Cassidy*, 22 Minn. 312, 322.

2. The second objection to the act is that it is partial or class legislation, in that it gives to publishers of newspapers certain rights and immunities not given to other defendants in actions for libel. It does not follow that it is unconstitutional because its provisions are limited to the publishers of newspapers. Laws public in their objects may be confined to a particular class of persons, if they be general in their application to the class to which they apply, provided the distinction is not arbitrary, but rests upon some reason of public policy growing out of the condition or business of such class. Such distinctions are being constantly made, as in the case of minors, married women, common carriers, railroad companies, and the like. This kind of legislation is not confined, as plaintiff seems to contend, to cases involving the exercise of what is termed the " police power " of the state. For example, it may be public policy to give to laborers a lien or other preference for the collection of their wages, not given to other creditors; or to give a lien to laborers in one business, while it would be neither practicable nor politic to give it to laborers in some other employment. So long as a law applies equally to all engaged in that kind of business, treating them all alike, subjecting them to the same restrictions, and giving them the same privileges under similar conditions, there it is public in its character, and not subject to the objection of being partial or unequal legislation, provided, of course, as already stated, the distinction made by it is based on some reason of policy, and is not purely arbitrary. Cooley, Const. Lim. 481, *et seq.* The act under consideration applies alike to all publishers of newspapers. And in view of the nature of the business in which they are engaged, and the fact that newspapers are the channels to which the public look for general and important news, and that, even in the exercise of the greatest care and vigilance, and actuated by the best of motives, they are liable through honest and excusable mistake to publish what may afterwards prove to be false, we cannot say that it is either arbitrary or without reason of public policy to make such provisions as are made by this act for the special protection of newspaper publishers when sued for libel.

3. The third, and by far the most serious, objection urged against this act is that it conflicts with section 8, art. 1, of the constitution, which provides that "every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property, or character." It is contended that the act in question is unconstitutional for the reason that it deprives a person of an adequate remedy for injuries to his reputation, because in certain cases it limits his right of recovery to special damages of certain kinds, specified in the second section, and prohibits the recovery of general damages,—that is, damages to character or reputation,—which the law presumes, without proof, from the mere fact of the falsity of the publication; and hence, in such cases, if a person is unable to prove any special or pecuniary damages, there could be no recovery at all. The question is not without difficulty, or free from doubt. This act undoubtedly assumes to introduce an important and radical change in the law of libel, and, as legislation of the kind is comparatively new, judicial precedents are almost wanting. The parent act for the protection of newspaper publishers when sued for libel seems to be chapter 96 of 6 & 7 Vict., known as "Lord Campbell's Act." But this merely provided that the defendant might plead that the libel was published without actual malice, and without gross negligence, and that before the commencement of the action, or at the earliest opportunity afterwards, he published in such newspaper a full apology, and that at the same time he filed this plea the defendant might pay into court a sum of money by way of amends for the injury. This plea was allowed in mitigation of damages, and the payment into court operated as a tender. In Connecticut, in 1855, an act was passed, which, although not so limited by its terms, was evidently designed for the protection of newspaper publishers, and which provided that "in every action for libel the defendant may give proof of intention; and unless the plaintiff shall prove malice in fact, he shall recover nothing but his actual damages proved and specially alleged in the declaration." Although very different in form, it will be observed that, so far as the question now being considered is concerned, this statute is in effect much the same as ours, assuming that "actual damages," as defined in the second section, can be

given a construction that will cover all special damages. This act has been twice before the supreme court of Connecticut, first in *Moore* v. *Stevenson*, 27 Conn. 14, and next in *Hotchkiss* v. *Porter*, 30 Conn. 414. While in both cases the construction, rather than the constitutionality, of the act seems to have been the question presented to the court, yet in passing upon the first they seem to have had the latter in mind, and succeeded in giving it a construction which in their opinion would be consistent with its validity. They seem to have had some difficulty in doing this, and it is very evident that the act did not commend itself very strongly to the favor of the judicial mind. Our act was copied from an act passed in Michigan in 1885, except that the latter expressly excepted from its operation publications involving a criminal charge. This act was recently before the supreme court of that state in the case of *Park* v. *Detroit Free Press*, (Mich.) 40 N. W. Rep. 731, in which it was held unconstitutional on the very ground here urged by plaintiff. While the views of that learned court, and especially of the eminent jurist who wrote the opinion in that case, are entitled to very great weight, yet we think they hardly have the authority of a decision of the question, because it was really not in the case, inasmuch as the court held that the publication involved a criminal charge, and hence was not within the operation of the statute. We are therefore compelled to consider the question mainly upon principle as *res integra*, which it certainly is in this state.

The guaranty of a certain remedy in the laws for all injuries to person, property, or character, and other analogous provisions, such as those against exacting excessive bail, imposing excessive fines, inflicting cruel and inhuman punishments, and the like, inserted in our bill of rights, the equivalents of which are found in almost every constitution in the United States, are but declaratory of general fundamental principles, founded in natural right and justice, and which would be equally the law of the land if not incorporated in the constitution. There is unquestionably a limit in these matters, beyond which if the legislature should go, the courts could and would declare their action invalid. But inside of that limit there is, and necessarily must be, a wide range left to the judgment and discretion of

the legislature, and within which the courts cannot set up their judgment against that of the legislative branch of the government. These constitutional declarations of general principles are not, and from the nature of the case cannot be, so certain and definite as to form rules for judicial decisions in all cases, but up to a certain point must be treated as guides to legislative judgment, rather than as absolute limitations of their power. And in determining whether in a given case a statute violates any of these fundamental principles incorporated in the bill of rights, it ought to be tested by the principles of natural justice, rather than by comparison with the rules of law, statute or common, previously in force.

Again, it must be remembered that what constitutes "an adequate remedy" or "a certain remedy" is not determined by any inflexible rule found in the constitution, but is subject to variation and modification, as the state of society changes. Hence a wide latitude must, of necessity, be given to the legislature in determining both the form and the measure of the remedy for a wrong. Now, at common law the remedy allowed to a person injured by a libel was— *First*, special damages for every injury of a pecuniary nature resulting from the wrong, which he had to both plead and prove; and, *second*, general damages, that is, damages to his standing and reputation, which the law presumed, without proof, from the fact of the publication of a libel actionable *per se*. Moreover, malice was the gist of every action for libel; either malice in fact, consisting of improper and unjustifiable motives, or constructive malice, which the law presumed, without proof, from the fact of the falsity of the publication. Evidence of intention, that is, of the absence of malice in fact, was always admissible, where the communication was privileged, in justification, and, where it was not privileged, in mitigation of damages. A retraction of the libel was also always admissible in mitigation. In effect, this statute but extends this rule of evidence so as to permit evidence of intention,—good faith,—coupled with a full retraction, not merely in mitigation of damages, but to prevent the recovery of general damages, as distinguished from special damages for injuries of a pecuniary nature. Now, in an action for libel, the object, so far at least as general damages is concerned, is not

merely to obtain redress in the shape of pecuniary compensation, which is frequently but a secondary consideration, but also—which is usually of much greater importance—of vindicating the plaintiff's character by openly challenging his accusers to proof of their assertions, and of establishing their falsity, if they be false. Now, as far as vindication of character or reputation is concerned, it stands to reason that a full and frank retraction of the false charge, especially if published as widely and substantially to the same readers as was the libel, is usually in fact a more complete redress than a judgment for damages. Indeed, where there has been perfect good faith, and an entire absence of improper motives, in the publication of a libel, and no special or pecuniary injury has resulted, an action for damages, brought after such a full and frank retraction and apology, is in a majority of cases purely speculative. It may be said that a retraction is not a complete remedy for injury to reputation, because even retracted falsehood may be repeated without the retraction; but the same may be said of it even after the falsity of the charge is established by a judgment for damages. It is also true that a retraction is not the remedy in the law guarantied by the constitution, and, if the statute proposed to substitute it as a redress for pecuniary injuries, it could not be sustained. But if there was an entire absence of either negligence or improper and unjustifiable motives, but, on the contrary, perfect good faith on part of the publisher of the libel, and if he has done all that can reasonably be done in redressing the wrong, so far as it has affected a party's character, by publishing a full retraction, what principle of reason or natural justice is violated by limiting the recovery of pecuniary damages to the pecuniary injuries which he has sustained? Or, if good faith can be shown in mitigation of damages, what constitutional provision is violated by permitting it to be proved in connection with a retraction, so as to prevent altogether the recovery of money damages for the presumed injuries to reputation which are not at all pecuniary in their nature, and which have already been redressed, as far as they can be, by the retraction? A court ought not to declare invalid a solemn act of a co-ordinate branch of the government, except in a very clear case; and after all the consideration that we are able to give to the sub-

ject, we are unable to say that the legislature has transcended its constitutional powers in imposing these restrictions and limitations upon the legal remedy of plaintiffs in actions for libel, or that by so doing they have deprived any one of "a certain remedy in the laws for injuries or wrongs received by him in his person, property, or character," within the meaning of the constitution..

We have assumed that under this act a party is still allowed to recover pecuniary compensation for all injuries pecuniary in their nature which he may have sustained by the libel. Section 2, in defining "actual damages," limits them to damages in respect to property, business, trade, profession, or occupation. It may be suggested that there may be some cases of pecuniary injury which this would not reach, but we are of opinion that, by a liberal but allowable construction, the definition referred to may be made to cover all cases of special damages; and, if so, we ought to adopt such construction rather than hold the act invalid.

4. The next question is whether upon the evidence the question should have been submitted to the jury whether " the article was published in *good faith;* that its falsity was due to mistake or misapprehension of the facts." This depends upon what is meant by the expression " in good faith," as used in this connection. We may assume that the act was designed to protect honest and careful newspaper publishers. It is not to be presumed that the legislature intended to make so radical a change in the law of libel as to make *mere belief* in the truth of the article the test of good faith. If so, they have introduced a very dangerous principle, which virtually places the good name and reputation of the citizen at the mercy of the credulity or indifference of every reckless or negligent reporter. Good faith requires proper consideration for the character and reputation of the person whose character is likely to be injuriously affected by the publication. It requires of the publisher that he exercise the care and vigilance of a prudent and conscientious man, wielding, as he does, the great power of the public press. There must be an absence, not only of all improper motives, but of negligence, on his part. It is his duty to take all reasonable precautions to verify the truth of the statement, and to prevent untrue and injurious publications against oth-

ers.   The extent and nature of these precautions will depend upon
and vary with the circumstances of each case, such as the nature of
the charge, the previous known character and standing of the person
whom it affects, the extent to which the report has already gained cir-
culation and publicity.   If it is a piece of news in which the public
may be presumed to have a lawful interest, good faith might permit
a line of action which would not be permissible in the case of an item
of mere scandal, of no legitimate interest to the public.   If a publisher
of a newspaper, for the sake of gratifying a depraved public taste, or
for the sake of being considered " newsy," and " scooping" other news-
papers, should recklessly or even negligently publish a piece of scan-
dal about another, without taking such precautions to verify its truth
as would be taken by a conscientious and prudent man under like
circumstances, then he would not be acting in good faith, within the
meaning of this statute, even although he may have a belief that the
publication is true.   Such conduct would not be a performance of
his legal duty in guarding against wrongfully injuring the reputation
of others.   If, on the other hand, he take all such reasonable pre-
cautions, and has then a reasonable and well-grounded belief in the
truth of the statement, and then publishes it as a matter of news, and
it nevertheless proves to be false, he acts in " good faith."   This is
what we think the statute means, and is all that any honest and fair-
minded newspaper publisher will demand.   See *Moore* v. *Stevenson,*
*supra.*

In view of another trial of this action, it would be improper to dis-
cuss the evidence, or characterize the conduct of the reporter who
transmitted this article to the defendant for publication.   All that it
is proper to say is that, applying the law, as we have construed it, to
the evidence, we are of the opinion that the question of " good faith"
in publishing the article should have been submitted to the jury.

Order reversed.

DICKINSON, J., (*dissenting.*)   I am unable to concur in that part of
this opinion presented in the third division, holding that the statute
is not in conflict with section 8 of article 1 of the constitution.