JAMES M. CLANCY v. DAILY NEWS CORPORATION AND ANOTHER.[1]

January 21, 1938.

No. 31,316.

[1]Reported in 277 N. W. 264.

2

*Kyle & Kyle,* for appellant.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly,* for respondents.

HOLT, JUSTICE.

Plaintiff appeals from an order denying a new trial after an adverse verdict.

The action is to recover damages for the publication of three libels. Plaintiff had served as councilman of the city of St. Paul from 1918 to June 1, 1930. In the preceding spring election he ran for mayor, and lost. From June 1, 1924, until June 1, 1930, he had been in charge of the department of public safety under the title of commissioner of public safety. He was an unsuccessful candi-

date for councilman in the 1932 spring election: He was a candidate for the same office in the election held April 24, 1934, having been the third highest of the six successful councilmen candidates at the primary. Defendant corporation has for many years published, in the city of St. Paul, the *Daily News,* having a circulation of more than 70,000 copies. Defendant Kahn during the times here involved was the editor. On April 19, 1934, he wrote and caused to be published in the *Daily News* the libel contained in the first cause of action; on April 20, the libel upon which the second cause is based; and on the next day the one alleged as the third cause. It appears unnecessary to set out each publication in full or to attempt to indicate the form or type used. Suffice it to say that each article occupied the front page, the headlines running right across the whole page in very large type, and each was signed by defendant Kahn as "Editor, The Daily News."

A bond issue of $15,000,000 had been authorized by the electors to be used for certain needed improvements in the city. Among these were police and fire alarm signals and a public safety building. In addition, there was need of traffic signals, but nothing was available for this out of the bond issue. In 1929 and early 1930 contracts were let for all three purposes. The first publication relates to the installation of the police and fire alarm system, let to the Gamewell Company of Newton Upper Falls, Massachusetts, in December, 1929, for $209,302, under a contract and specifications whereby the city was to pay 50 per cent of the contract price when the company adduced satisfactory proof to the city that 75 per cent of the equipment had been manufactured. The specifications upon which the bid was made and the contract let were under the supervision of plaintiff. The company wrote plaintiff that it had manufactured more than 75 per cent of the contract and requested the city to send someone at the company's expense to the factory to ascertain that fact. Pursuant to that request, plaintiff, J. A. Macauley, superintendent of the police and fire alarm system, and W. F. Wright, a fire captain, in May, 1930, drove in plaintiff's automobile to Newton Upper Falls and ascertained that the company had manufactured and had ready for shipment more than 75 per cent of.

4

the contract. Plaintiff was handed $500, for expenses, by the company. The trip consumed two weeks for two of the officials. Macauley returned by train. The first alleged libel was headed:

"Mr. Clancy takes a trip that cost St. Paul taxpayers thousands of dollars."

It recites that "on a night in May four years ago a fire department automobile glided out of St. Paul" and sped easterly, giving the names of the occupants and their destination, and repeated in bold type, "The motor trip cost St. Paul taxpayers thousands of dollars," and stated that the object was to inspect the $220,000 equipment, which was approved and ordered sent to St. Paul.

"Consider, Mr. Taxpayer, these facts:
"St. Paul didn't need this equipment.
"Most of it was obsolete before it left the factory.
"A large part of it in the original crates is still stored in a local fire engine house.
"Police radio service was already under way.
"New and advanced signal equipment was announced by the Gamewell company a few weeks after they unloaded the old stuff on St. Paul officials."

It then states that Mr. Clancy was to leave the office in a few days; and before starting the trip Macauley wrote the company that Clancy and O'Connell were defeated, but no trouble was expected with the newly elected officers; that they took the trip at the company's expense so as to make it possible for the company to collect for a lot of useless and obsolete material purchased against the recommendations of the National Board of Fire Underwriters.

"It was a terrific waste of money for which the taxpayers are still being penalized.
"Mr. Clancy was defeated when it was shown how costly and extravagant was his administration."

Stating that his colleagues on the council rewarded him with a "lameduck" appointment as city purchasing agent, at $4,500 a year, the publication ended with:

"He seeks a position on the Council once more.

"He is a pleasant but expensive luxury."

The theme of the article published April 20, 1934, was the traffic signals in the center of street intersections, called "bobby" signals, the heading being:

"Mr. Clancy's pet 'bobby' signals cost St. Paul many thousand dollars."

It referred to them as obstructing traffic, costing $932 apiece to install, and $27 a month to operate; that they literally peppered the streets; Clancy's pet solution of the traffic problem, when he was commissioner of public safety and insisted on their installation; that to get a lot of them a special bill was put through the legislature which provided for an appropriation of $47,000 county funds to buy and install them. "Despite the recommendations of qualified engineers and opposition of a minority of the members of the county board, a contract was awarded the high bidder"; that a former state senator had been paid "$2,000 'commissions' by company which made the signals." The *Daily News*, to prevent "this raw deal from going through," went to court to restrain the award of the contract at the high bid, and before the court could act the county board awarded the installation to another company at a saving of nearly $10,000 to the taxpayers. It was stated that four-corner signals could have been installed to the convenience of motorists and saving of the taxpayers. It then referred to "another costly example of this poor business management" in "the planning and construction of the $450,000 public safety building"; when Mr. Clancy refused to heed expert advice, causing fire hazards and expensive alterations, the planning being regarded as a comedy of errors; that "no administration, perhaps, has been so expensive to taxpayers as Mr. Clancy's administration of the department of public safety." In this connection it may be stated that L. 1929, c. 284, authorized the county board to appropriate $47,000 for the purchase of "stop" and "go" signals to regulate traffic in a city of the first class, the installation of which was to be supervised by the proper city authority—in this case by the commissioner of public safety.

The third publication bore the heading:

"Reign of terror and extravagance during Clancy administration, 1924-1930."

Then follows the statement that "bad as has been the record of the present police administration, the years from 1924 to 1930 were worse in some respects," and that Clancy, who spent thousands of dollars for obsolete and unneeded signal apparatus and "was responsible for the installation of costly and antiquated traffic 'bobbies,' was public safety commissioner in those days." It then gave a list of 18 unsolved murders during Clancy's regime and seven holdups or robberies, and stated that Clancy floundered helplessly, that not a single major reform was introduced in his department; his six-year term in the public safety department was wasteful, expensive, "characterized by an amazing record of violence and law flaunting." It stated that when people realized how bad conditions were they defeated him decisively, referred to the "lameduck" appointment, stated that he wanted a comeback as a councilman, but "will be defeated if citizens remember the reign of terror that existed from 1924 to 1930."

The answer admitted the publications, and alleged as a defense that at the time thereof plaintiff was a candidate for the office of councilman in the city of St. Paul, and that the articles were each published in good faith, without malice, upon information received from trustworthy sources and believed to be true; and, further, that the matters published were in fact true and constituted fair comment with respect to a candidate for political office. The reply was a general denial.

The court viewed the publications as libelous and so charged the jury. The issues for the jury were made by the answer and reply. The record contains nearly 1,200 printed pages, not including the numerous exhibits—plaintiff's exhausting the alphabet five times. No summary thereof could be given within the proper limits of an opinion, nor would any good purpose be served thereby. The record of the action of the authorities in ordering the purchase and installation of the police and fire alarm system, the traffic signals, and

the planning and erection of the public safety building were received in evidence, including the plans and specifications, the bids, and the contracts resulting from the bids. Likewise were the actions of state motor traffic association and bodies such as the National Board of Underwriters. It is enough to say that, in general, both sides offered a mass of documents having a bearing upon the issues raised, and, if at all relevant, they were received. The assignments of error cover 27 pages of the brief, and only such as are deemed important or questionable will be referred to. All have been examined. The alleged errors relate to the rulings on evidence, the charge to the jury, the misconduct of a juror, and insufficiency of the evidence to sustain the verdict.

Errors are assigned upon the exclusion of grand jury reports, of reports of grand jury committees, and of reports of crime commissions appointed by governors (assignments 3(r), 3(8), 3(w), 3(pp), 3(qq), 3(rr), 3(tt), 3(uu), 3(vv), 3(ww), 3(xx), 3(yy), 3(zz), 3(aaa), 4(a), 4(b), 4(c), 4(o), 4(p), 3(oo), 3(ss), and 0000). Insofar as the *Daily News* had published editorials or news items respecting these reports, such publications were received. But as substantive proof of the conclusion arrived at respecting the subjects investigated the reports were not admissible against defendants, who had no opportunity to cross-examine the authors of the reports to ascertain how they arrived at their conclusions and the facts upon which they were based. And, so far as the parties hereto are concerned, the reports were mere hearsay. No statute is cited which makes such reports evidence for or against anyone. We think these reports were properly excluded. But plaintiff claims that even if the reports were not as to defendants proof of the existence of the facts therein contained, they should have been admitted to prove malice, in that defendants had knowledge of the reports and did not attempt to ascertain their truth prior to publishing the alleged libels. But we think the court let plaintiff go as far as was relevant and material when knowledge was brought home to defendants of the existence of the reports by defendants' comments thereon in the *Daily News* admitted in evidence. In one instance a resolution of a local association in respect to the "bobby."

8

signal was received to impeach defendant Kahn's testimony, but that does not make admissible the resolution of another local association where no occasion for impeachment existed. Certain forms of questions put to witnesses by plaintiff's counsel were excluded on objection; but when the same information was sought by proper inquiries it was permitted. And we think the numerous questions calling for conclusions of witnesses were, on objection made, properly ruled out. Because part of the report of a crime commission was received when offered by plaintiff is not a good reason for admitting another portion thereof later offered by plaintiff.

In respect to the charge, this general observation may be made: Had the court given plaintiff's 19 requested instructions covering seven pages of the printed record, the defendants would have just cause for complaint that plaintiff's side of the controversy was given too much prominence. Some of the requested instructions were given verbatim, some were refused, and many were given with modifications—the whole charge being a succinct and, we think, adequate and correct statement of the applicable rules of law. In the examination of alleged errors in the charge the fact is to be kept in mind that these publications were conditionally privileged in that plaintiff was a candidate for public office at the approaching election and that their falsity is not alone enough to authorize a recovery. Plaintiff must, in addition, prove that they were published maliciously. It is not the same as publishing a libel concerning one not a candidate for a public office where, from the fact of the falsity of the charge, malice is presumed. Of the latter sort are the cases cited by plaintiff of Shull v. Raymond, 23 Minn. 66; Allen v. Pioneer-Press Co. 40 Minn. 117, 41 N. W. 936, 3 L. R. A. 532, 12 A. S. R. 707; Thorson v. Albert Lea Publishing Co. 190 Minn. 200, 251 N. W. 177, 90 A. L. R. 1169. The defendants had the right to use the columns of the *Daily News* to defeat plaintiff's election, provided the publications were fair and not fabrications. Malice cannot be established by merely showing defendants' purpose was to prevent plaintiff's election. Complaint is made because the court did not instruct: "Mere belief in the truth of the statements is not sufficient to constitute good faith. * * * It requires

* * * the care and vigilance of a prudent and conscientious person, * * * an absence not only of all improper motives but of negligence," and the giving of this alleged opposite instruction: "It is not a malicious act to publish in a newspaper information relative to the unfitness of a candidate for the office he seeks which the publisher has reasonable ground to believe is true." The requested instructions were taken from Justice Mitchell's decision in Allen v. Pioneer-Press Co. 40 Minn. 117, 41 N. W. 936, 3 L. R. A. 532, 12 A. S. R. 707, and the other cases mentioned concerning a libel of one not a candidate for public office. Such also were the cases of Mallory v. Pioneer-Press Co. 34 Minn. 521, 26 N. W. 904; Trebby v. Transcript Publishing Co. 74 Minn. 84, 76 N. W. 961, 73 A. S. R. 330; Gray v. Times Newspaper Co. 74 Minn. 452, 77 N. W. 204, 73 A. S. R. 363, cited by plaintiff.

It is to be noted that the court charged that the publications were libelous on their face, but, being published in respect to plaintiff's candidacy for a public office at the impending election, they were conditionally privileged. That being so, it was not enough that the jury found them false, the burden fell on plaintiff to prove actual malice motivating defendants, and the court charged:

"Proof of actual malice may be made by showing bad faith in the defendants. It may appear that the occasion was made use of as camouflage behind which to hide for the purpose of maligning plaintiff in a way not justified by the facts. Malice may be proved by extrinsic evidence of personal ill feeling or otherwise, or by intrinsic evidence, such as exaggerated language of the libel, the mode and extent of publication and repetition, or other matters in excess of the qualified privilege."

We deem this substantially complied with the instructions plaintiff requested (assignment of errors 3(e)) and accords with Friedell v. Blakely Printing Co. 163 Minn. 226, 203 N. W. 974. Later in the charge the court stated:

"The publication loses its qualified privilege if the statement is false and knowledge of the falsity is brought home to the defend-

ants. Likewise it loses its qualified privilege if the publication is malicious and false."

We think the court rightly said "malicious and false," the publications being qualifiedly privileged.

While the court placed the burden of proving malice upon plaintiff, the burden of proving the truth of the publications was placed upon defendants, as well as justification, in case of failure, to prove the entire truthfulness thereof. In that respect the jury were instructed to consider "the information available and investigation made, and the information obtained" by defendants.

In these alleged libels there is nothing in express terms disparaging to the personal honesty and integrity of plaintiff. The editorials published endeavor to show plaintiff's unfitness for the office he seeks by his former official conduct in the same office. In the trial defendants admitted plaintiff's good character. The publications being conditionally privileged, malice was not presumed from their falsity alone, so in order to award damages it was necessary for the jury to find both falsity and malice. Such is the law in this state as established by Friedell v. Blakely Printing Co. 163 Minn. 226, 203 N. W. 974. See also Rigney v. W. R. Keesee & Co. 104 W. Va. 168, 139 S. E. 650, annotated in 54 A. L. R. 1139. This accords with what the author calls the minority rule in the annotation to Washington Times Co. v. Bonner, 110 A. L. R. 393 (66 App. D. C. 280, 86 F. [2d] 836). We think the words "actual malice," "ill will," "ill feeling," "bad faith" are understood by the average juror so that no criticism should fall on the trial court for not attempting to define them. It is not necessary further to consider the charge of the court, or the modification of plaintiff's requests. As a whole, the charge is deemed legally correct and adequate.

During the trial a juror was guilty of misconduct. The court inquired into the matter, but, after a hearing and taking of testimony, concluded that the misconduct was not such as to justify the declaration of a mistrial. There is nothing to indicate that either party was prejudiced by the juror's indiscretion.

The last contention to be noted is the insufficiency of the evidence to sustain the verdict. In passing on the proposition, the qualifiedly privileged character of the publications must be kept in mind. Not only defendants, but the public—the readers of the *Daily News* residing in the city of St. Paul—were interested in selecting the best fitted of the councilmen candidates at the approaching city election. Plaintiff had for a long period prior to 1930 served as councilman. It is not to be expected that one in that position has been so able to perform his many official acts that all the electors have been satisfied. No matter how competent and well intentioned a councilman may be, some of his official doings during a long incumbency may be shown to have been unwise when tested by experience. Again, what one citizen may consider to have been conducive to the best interests of the city another may believe highly detrimental. So, of course, a candidate's prior official conduct may be the fair target of comment and criticism when he again seeks such office. It is well recognized that such a one must endure the usual extravagance of language and the profuse use of capitals on the front page of a local newspaper when its editor is against him. Herringer v. Ingberg, 91 Minn. 71, 97 N. W. 460; Fullerton v. Thompson, 123 Minn. 136, 143 N. W. 260. It is only former official acts that are found fault with in these publications. The jury had the articles in the form published. They had the situation to which the articles relate presented to them not only by oral testimony but by a vast quantity of documents. Whether the publications were substantially true, whether they constituted fair comments upon plaintiff's past official acts, whether defendants acted in good faith upon available information, or whether the publications were actuated by malice was for the jury. As an instance of just cause for criticism may be mentioned the manner in which an agent of the Gamewell Company aided in formulating the specifications upon which the bid for the police and fire alarm system was obtained; also the peculiar provision in the contract that half the purchase price should be paid when 75 per cent of the equipment had been manufactured; that three city officials should absent themselves (two for two weeks) from their duties in the city to go to Massa-

chusetts to ascertain the fact as to status of the manufacture of the equipment; the payment of $500 for expenses of the trip by the company; the criticism in respect to the planning of the public safety building, and the purchase of the "bobby" traffic signals may appear to have less meritorious foundation; the article in respect to the unsolved murders and robberies, the jury might well conclude to have been justified by inferences from matters proved. The jury, we think, could, under all the facts, find that each publication, standing alone or in connection with the others, was no more than fair comment upon plaintiff's past career as an official as ascertained after diligent inquiry from the best sources of information available to defendants, and that the publications were not proved malicious. Whether the publications or any of them were malicious was unquestionably for the jury. It is readily conceded that, had the jury awarded plaintiff a verdict, the record would have sustained it.

The order is affirmed.

