HALLAM v. POST PUB. CO.

(Circuit Court, S. D. Ohio, W. D. April 25, 1893.)

No. 4,573.

1. LIBEL—INTENT OF WRITER—INSTRUCTIONS.

In an action by a candidate for a party nomination to congress for a libel charging him with the transfer, by bargain and sale, of his supporters, to the successful candidate, want of actual intent to vilify is not a justification; and an instruction requested by the defendant, that plaintiff must satisfy the jury by a preponderance of proof that, by the article complained of, the defendant intended to charge the plaintiff with the transfer of his supporters by bargain and sale, is properly refused, the only question being what was the fair and reasonable construction of the language used.

**2.** SAME—CANDIDATE FOR OFFICE—REPUTATION FOR INTEGRITY—EVIDENCE.

In such action, defendant introduced testimony tending to prove that plaintiff's reputation for integrity in politics was bad, directing the inquiry specially to his reputation "as to the mode in which he conducted politics," and "as to selling out." In rebuttal, plaintiff introduced evidence that his reputation for integrity, "in politics and otherwise," was good. *Held*, that the testimony offered by the plaintiff in rebuttal was properly received, and that it was not error to refuse to confine it within the limits of the testimony for defendant, i. e. to the reputation of the plaintiff in politics, in the particulars brought out in the defense.

**3.** SAME—PRIVILEGE—CONDUCT OF PUBLIC MEN.

In America, as in England, the defense of privilege is confined to comment and criticism of the acts of public men, as they actually happened, and does not extend to false assertions of fact.

**4.** SAME—CANDIDATE FOR NOMINATION TO OFFICE—PRIVILEGE.

The privilege of commenting on and criticising the acts of public men does not justify the publication in a newspaper of an article which falsely asserts that a candidate for a party nomination to congress "sold out" and transferred his supporters to a rival candidate, and when the truth of the facts stated in the article is in issue the jury is properly instructed that the facts which gave rise to the comments must be proved substantially as alleged; that it is no defense that the writer, when he wrote, honestly believed in the truth of the charges, if the charges were made recklessly, unreasonably, and without any foundation in fact; and that, in so far as the publication fell within the limits of criticism and comment, it was privileged, but in so far as it went beyond that the defense of privilege failed.

At Law. Action by Theodore F. Hallam against the Post Publishing Company for damages for a libelous publication. Verdict for the plaintiff for $2,500. On motion for a new trial. Denied.

Wilby & Wald and W. H. Jackson, for plaintiff.
Bateman & Harper, for defendant.

SAGE, District Judge. The plaintiff's action is for the recovery of damages for libel by reason of the publication by the defendant of the following article in the Cincinnati Evening Post of the 14th of October 1892:

Every Odd Expenses on Theo. Hallam in the Sixth (Ky.) District Contest for the Nomination of a Democrat for Congress.

The Berry-Hallam congressional fight in the sixth Kentucky district is still on. That is to say, Banquo's ghost bobs up now and then, to the annoyance of the congressional nominee, Berry, and the mortification of the defeated candidate, Theo. F. Hallam.

The Boone County Recorder delivers a broadside at the Kenton county delegates, and naively asks: "Why don't they come out, and tell the truth about what induced them to go to Berry? The world knows."

Yes, the world knows, and you might say Mars and the other planets know it also.

Proprietor Roth, of the St. Nicholas Hotel, has an inside "cinch" on this information.

Every one knows Colonel Berry. He is a monopolist, corporation controller, millionaire speculator, political wire puller, first-class hustler, and a pretty good sort of fellow.

Hallam is a successful lawyer at Covington, but legal eminence there does not mean the fat incomes that are its synonyms on this side of the Ohio. Hallam is one of the "bhoys," loves ward politics for the fun, if not the emoluments, and is about as poor as a church mouse. In fact, he owes several hundred dollars for taxes.

The two counties, Kenton and Campbell, threw out their hooks for the congressional nomination. Kenton swore by Hallam, while Campbell vowed that the political friend and chum of Carlisle, Cassius M. Clay, Jr., and Charles J. Helm, their own millionaire and boss, Albert S. Berry, should be the nominee.

The fight waxed hot. The convention was held at Warsaw, commencing on September 27th, and ending September 30th.

The Kenton boys prepared for the fray. The principal preparations consisted in engaging the steamer Henrietta to carry the delegates to Warsaw, and the carte blanche orders to Mr. Roth, of the St. Nicholas hostelry, to fill her up from truck to keelson with the best the cellar and the larder of the house afforded.

As one delegate remarked:

"Why, the champagne flowed off the decks so much that even the Henrietta was swimming in it."

"Hallam and his crew did all the feasting and the drinking. The Campbell men were not in it."

But the bill was made out to Colonel A. S. Berry. Here is the bill:

"St. Nicholas. Edward N. Roth. Cincinnati, Oct. 10, 1892. Colonel A. S. Berry, per Theodore F. Hallam, to the St. Nicholas Hotel Company, Dr.: For meals, service, wine, and cigars served on board steamer Henrietta, $865.15."

Then again: At Warsaw the battle raged four days. On the last day Colonel Berry and Lawyer Hallam were seen to go arm in arm to the rear of the courthouse where the convention was held. They had a quiet and confidential chat.

At its conclusion, Hallam called his warriors about him, and spoke to them in whispers.

Immediately thereafter the whole Kenton county delegation cast its vote for Colonel Berry, and he received the nomination.

Is Colonel Berry carrying out all and every of the promises he made? Ah, there's the rub.

Mr. Roth, of the St. Nicholas, has sent a bill of $865.15 to Colonel A. S. Berry.

That bill is for "dry" and wet provisions ordered by Hallam, and disposed of by Hallam's supporters.

Such generosity on the part of the victor to the vanquished is truly touching.

The jury returned a verdict for $2,500 in favor of the plaintiff, and the case is now before the court on defendant's motion for new trial. The first reason urged is that the court refused a special charge requested on behalf of the defendant,—that, to entitle plaintiff to recover, he must satisfy the jury by a preponderance of proof, in support of the innuendo set forth in the petition, that by the article complained of the defendant intended to charge the plaintiff with the transfer, by bargain and sale, of his supporters to Berry. The charge was properly refused because the question was not what the defendant "intended,"—that was immaterial,—but what was the fair and reasonable construction of the language used,—what meaning it conveyed. Want of actual intent to vilify is no excuse for a libel. Curtis v. Mussey, 6 Gray, 265. Upon the trial the defendant offered evidence tending to prove that rumors of a "sell out" by the plaintiff to Berry were rife after the final ballot by which Berry was nominated, and that those rumors came to the knowledge of defendant's reporters who attended the convention, and through them to defendant's managing editor, before publication of the alleged libel. In rebuttal, testimony was admitted tending to prove the prevalence of rumors at the same time and place that the transfer of Hallam's support to Berry was made to defeat the scheme of the outlying counties of the district to nominate one or another

of their candidates,—as they had done on previous occasions,—by reason of the continued antagonism of the delegates from Kenton (Hallam's county) and Campbell, (Berry's county.) This, it is claimed, was not competent in rebuttal, because it did not tend to prove that rumors of the sort testified to by witnesses on behalf of the defendant were not in circulation. The testimony relating to rumors which was offered on behalf of the defendant was admitted without objection, under the defense of privilege, as tending to show probable cause and good faith, and as proper evidence in mitigation of damages. In rebuttal the plaintiff introduced, not only the evidence of other rumors, as above, but also that the rumor of a "sell out" were limited, while the other rumors were general. The jury was charged that, if the defendant relied upon rumors in justification of his comments upon the conduct of the plaintiff, it was bound to take into account the rumors on both sides,—those that the reporters heard, and those that, by a fair and proper exercise of their opportunities, they might have heard on both sides. In this view the evidence in rebuttal was competent, as tending to negative the defense of good faith.

The defendant introduced testimony tending to prove that plaintiff's reputation for integrity in politics was bad, counsel directing the inquiry specially to his reputation "as to the mode in which he conducted politics," and "as to selling out." No objection was made, and the testimony. went in. In rebuttal, plaintiff introduced evidence of witnesses that his reputation for integrity, "in politics and otherwise," was good. It is objected that that was too broad; that the proof in response should have been confined within the limits of the testimony for defendant,—that is, to the reputation of the plaintiff in politics in the particulars brought out in defense. Testimony as to reputation, in such a case as this, is competent on several grounds. The weight of authority is that evidence of general bad reputation is admissible in mitigation of damages, and that evidence of bad reputation as to that phase of character involved in the case is competent, not to establish any facts in issue, but to explain conduct, and to enable the jury to better weigh evidence upon doubtful questions of fact bearing upon the character of the defendant. Where the reputation to be inquired of relates to the phase or trait of character involved, it is not reputation of having on previous occasions been guilty of acts of the same sort as those charged that is competent, but reputation as to the characteristic displayed in the acts charged. Upon a trial for theft the defendant may go into testimony as to his general reputation for honesty, but the prosecution would not be allowed to prove in rebuttal that the defendant was generally reputed to have been theretofore guilty of like thefts. It would be confined to testimony of his general reputation for honesty or for thieving. The law does not recognize one standard of integrity in politics, and another in private life. In this case it is a question of reputation for integrity, to be tried by a fixed standard of universal application, and gauged by the meaning of the word. It is for injury to that reputation that the plaintiff claims damages, and he had the right, in re-

buttal, to show what it was. The cases cited for the defendant do not conflict with this view. In Gilchrist v. McKee, 4 Watts, 380, it was held that the character of a female witness for veracity may not be impeached by evidence of her general reputation as to chastity. That decision is in line with the conclusions above stated. The court rightly said that if character for veracity was involved an inquiry into anything else was illegitimate. In Conroe v. Conroe, 47 Pa. St. 198, where unchastity had been imputed to the plaintiff, who sued for slander, the court below excluded evidence to prove that the general character of the plaintiff for chastity was bad, and ruled that only evidence of general reputation—that is, as a whole—was receivable. The supreme court reversed the judgment. The ruling in Drown v. Allen, 91 Pa. St. 393, another slander case, was that in an action for slander the defendant might show in mitigation of damages the general bad character of the plaintiff "for the particular thing with which he was charged." The charge was that he was a thief. The question which the court below overruled was, "What is the general reputation of the plaintiff as to being a thief?" The question allowed was as to the general reputation of the plaintiff for honesty. The supreme court reversed these rulings, holding that a man might be dishonest without being a thief, although he could not be a thief without being dishonest, but still the reputation ruled competent was the general one of being a thief. Moyer v. Moyer, 49 Pa. St. 210, was an action for defamation, the plaintiff claiming that he had been charged with perjury. It was held that it was error to exclude evidence that plaintiff's general reputation for truth and veracity in the neighborhood where he lived was bad. In Duval v. Davy, 32 Ohio St. 604, unchastity had been alleged, and it was held that evidence of the plaintiff's bad reputation for chastity was competent. All these cases—and the books abound in like cases—are in harmony with the views above expressed. The question always is, what trait of character is involved? The case of Sanford v. Rowley, 52 N. W. Rep. 1119, decided by the supreme court of Michigan October 4, 1892, is specially relied upon. That was an action for libel. The language complained of charged perjury upon the plaintiff below, and political treachery, with specifications undoubtedly libelous. The court said that the language was libelous per se. The defendant himself testified that the plaintiff's general reputation for integrity was bad. The supreme court held that testimony competent. Defendant was asked concerning the plaintiff's reputation for political integrity, but that question was not answered. The supreme court said that the question was a proper one, and that the defendant, under a plea of justification, had a right to give in evidence the political reputation of the plaintiff, and evidence that the plaintiff was generally regarded in the community where he lived as a person who in political matters was unworthy of belief, but that it would necessarily follow, if this were shown, that the plaintiff's general reputation for truth was bad; "for it can hardly be conceived that a person whose general reputation for truth is bad, in a political sense, has a good reputation for truth and

veracity in other matters." It is only applying the converse of the rule thus stated to hold that general reputation for integrity, not confining the inquiry to matters political, is competent in rebuttal of testimony attacking reputation for integrity in politics; and when the inquiry in rebuttal is, as it was in this case, as to the reputation for integrity in and out of politics, there can be no doubt of its competency.

The next proposition upon which the motion for new trial rests is that whether the publication is privileged is a question for the judge alone, (citing Odger, Sland. & L. 183,) and that it was error to leave it to the jury. In the charge, after a reference to the two classes of privileged communications,—those absolutely and those conditionally privileged,—the jury were told that every citizen has a right to comment freely upon the public affairs of the country by calling in question the acts of its officers, because the right to make such comment is inherent in our system of government, but that defamatory words spoken or published of an officer as an individual are not privileged on the ground that they relate to a matter of public interest, and are spoken and published in good faith. It was added that the same rules apply to candidates for nomination to public offices; that the right of comment belongs alike to every citizen, whether editor or individual; and that, if it were otherwise,—if we had not the right to express freely our opinions upon such matters, in order to protect ourselves against political corruption and abuses,—our rights as citizens would be so curtailed as to be in imminent danger of destruction. Then the court, after stating the distinction between criticism and defamation, instructed the jury that, when the defense of privilege is relied upon, it is for the court to say whether the article complained of is of the class of articles deemed privileged, and for the jury to determine whether it is within the limits of the privilege. The charge then proceeds:

"I will try to make this a little more plain. In the discharge of the duties devolved upon me, I have to say to you that in my opinion this article does fall within the class of privileged publications. Understand me. I am by no means saying that it is, as published, a privileged communication. That depends upon whether the limitations which I have already expressed have been observed. When I say that it falls within the class of privileged communications,—those that are conditionally privileged,—I mean that it relates to matters of public concern, which every citizen, every editor, has the right to criticise and comment upon. When I say that it is left to you to determine whether the article itself is privileged, or within the limits, I mean to be understood it is for you to determine whether the defendant has kept within the limits of criticism, or has gone beyond."

The attention of the jury was then directed to the publication, and to the claim for the plaintiff that it was false, malicious, and libelous, and to the claim for the defendant that there was no statement of fact that was not true, and no criticism not warranted by the facts; and it was left to the jury to decide, upon the evidence and upon the charge, what constitutes malice, and what is libelous, between those claims. The questions in dispute were largely questions of fact, and the court had no right to do anything else than leave them to the jury.

The jury were charged just before the adjournment of the court for the day, and by consent allowed to separate until the next morning. Then, before entering upon the consideration of the case, they were, in the presence of counsel, instructed upon one or two points not referred to in the general charge,—which was altogether oral,—and given a special charge which had been requested, but overlooked. The jury were instructed that comment on well-known or admitted facts was a very different thing from the assertion of unsubstantiated facts for comment, and that no one had a right to invent or suspect facts, and make them the basis of comments, however fair and bona fide; that the distinction between comment or criticism and allegations of fact could not be too clearly borne in mind; that the facts which gave rise to the comments must be proved substantially as alleged, and that it would be no defense that the writer, when he wrote, honestly believed in the truth of the charges, if the charges were made recklessly, unreasonably, and without any foundation in fact; also, that in so far as the publication sued upon fell within the limits of criticism and comment, it was privileged; in so far as it went beyond that, the defense of privilege failed.

It is objected that the law does not sustain the charge, and that it was inconsistent with the general charge. In the general charge the instruction was that if the jury come to the conclusion that the publication complained of was a fair, bona fide criticism, the defendant having reason to believe the facts as published, and the deductions warranted by the facts "as you find them, you would be justified in concluding that it was a privileged publication. If not, the article is a libel, if it tends to affect the reputation and standing of the plaintiff." Reasonable belief in the truth of the facts commented upon is as essential to fair comment as that the deduction be warranted by the facts, but the instruction was that the deductions were to be warranted by the facts as found by the jury. This is perfectly consistent with the subsequent instruction. It is to be borne in mind that these instructions were given after the plaintiff had introduced evidence tending to prove that the facts alleged were false, and by the defendant that they were true. But it was contended for the defendant that the privilege covers not only comments, but also statements of fact, and that the American rule is, by reason of the difference in government and institution, broader than the English rule. The English rule, as stated by Cockburn, C. J., in Seymour v. Butterworth, 3 Fost. & F. 377, is that if a writer asserts that a member of parliament had bargained to sell his vote upon a corrupt contract, or that a member would not have voted or spoken as he did but for a corrupt understanding that he should receive a reward, such would not be excusable as fair comment. See, also, Davis v. Shepstone, L. R. 11 App. Cas. 187, where Herschell, L. C., notes the distinction between comment or criticism and allegations of fact, and limits the privilege to the comment or criticism. See, also, Ogden, Sland. & L. *33 et seq., under the title "Criticism." The American rule, according to the weight of authority, is substantially the same. In Smith v. Tribune Co., 4 Biss. 477,

the rule is stated to be that a public journal has no right to make specific charges against a public man unless they are actually true, and mere honesty of motive is not a sufficient defense.   Judge Drummond said that if the rule were otherwise every public man would be at the mercy of every journalist, and they could launch charges against him with impunity.   So it has been held that the privilege of fairly canvassing the acts or conduct of public men does not include or imply a license to vilify or defame them.   Snyder v. Fulton, 34 Md. 128; Palmer v. Concord, 48 N. H. 211.   The supreme court of Massachusetts in Curtis v. Mussey, 6 Gray, 273, held that published charges against a public officer, of corrupt and improper motives, were not privileged, and that without a plea of justification there was no complete defense and legal bar to the action. In Hamilton v. Eno, 81 N. Y. 126, Chief Justice Folger, announcing the opinion of the court, said that the truth concerning a public officer might be published in good faith, but for what was false and aspersive the publisher was liable, however good his motives. In Seely v. Blair, (decided in 1833,) Wright, (Ohio,) 358, 683,—one of the early cases,—the supreme court of Ohio held that nobody has a right to slander, or utter falsehoods of, a public officer, or of a candidate for office; and in Publishing Co. v. Moloney, (decided January 31, 1893,) 33 N. E. Rep. 921, the same court said that the defense of privilege must be pleaded, (which has not been done in this case,) and, recognizing the right of free and full comment and criticism on the official conduct of a public officer, denied the doctrine that the press is privileged to speak as freely of the private character of the person holding the office as of his official conduct and character.   The court says:

"In our opinion a person who enters upon a public office, or becomes a candidate for one, no more surrenders to the public his private character than he does his private property."

The defendant in the case now before this court was the plaintiff in error in that case, represented by the same counsel, who apparently argued the same points, and presented the same authorities, as here.   The court cited with approval Seely v. Blair, supra, and held that "while it is the right of the press, as it is of individuals, to freely criticise and comment upon the official action and conduct of a public officer, false and defamatory words spoken or published of him, as an individual, are not privileged on the ground that they related to a matter of public interest, and were spoken or published in good faith."

Counsel cite Atkinson v. Free Press, 46 Mich. 341, 9 N. W. Rep. 501, but their references are to the dissenting opinion of Judge Cooley.   The decision of the court is against their contention. Miner v. Tribune Co., 49 Mich. 358, 13 N. W. Rep. 773, is not in point.   The acts of the police justice which were the subject of comment were not in dispute, and the supreme court held that the comments were privileged.   Palmer v. Concord, 48 N. H. 211, hereinbefore cited, does hold that if the publication is made from good motives, and for justifiable ends, a belief—founded on rea-

sonable grounds—of its truth is a good defense. The action was under a statute, upon the case, by the proprietor of a newspaper, for the destruction of his printing establishment by a mob. Illegal or improper conduct causing the destruction was made by the statute a defense, and it was claimed that the publication of articles alleged to have been libelous was the cause. The supreme court said that the 1st, 4th, and 5th articles—the only ones that contained any statements of facts—were prima facie libelous, and that their publication must be regarded as "illegal conduct" unless justified or excused by facts sufficient to constitute a defense to an indictment for libel. The holding that a belief, founded upon reasonable grounds, of the facts was included in the privilege is against the weight of authority. In Briggs v. Garrett, 111 Pa. St. 404, 417, 2 Atl. Rep. 513, Chief Justice Paxson called attention to the fact that the defendant made no charge of corruption in office against the plaintiff; that all he said (at a public meeting held pending the candidacy of the plaintiff for re-election) was that some one else, giving his name, had made such a charge in writing, and with that the defendant handed the writing to the secretary of the meeting to be read, and it was read. The court cited Hamilton v. Eno, supra, and several other cases, to the point that to falsely accuse a public officer of a crime is not privileged, and said that how widely what the defendant did differed from originating a false charge was plain to the dullest apprehension. The case is thus clearly distinguished from the case at bar. In Ex parte Steinman, 95 Pa. St. 220, 236, Chief Justice Sharswood said that the article complained of meant to charge, and did charge, that the judge had decided the case wrongfully from motives of political partisanship, and that it was a gross libel on its face. I am not able to recognize in that case an authority in favor of the defendant in this case. The case of Press Co. v. Stewart, 119 Pa. St. 584, 602, 603, 14 Atl. Rep. 51, is also cited for the defendant. In that case the court held that the article was not a libel, but, at most a harmless bit of pleasantry in which the reporter had succeeded in making himself somewhat ridiculous. The defendant pleaded the truth in justification, and the court held that it was error to refuse to instruct the jury that if they believed that the article was a fair and true account of the interview, the verdict must be for the defendant; belonging, as it did, in the opinion of the court, to the class of conditionally privileged articles. The court also held that no presumption of malice arose from the mere fact of publication, and that malice in fact must be proven before the plaintiff could recover. There is nothing in that case in conflict with the views expressed in this opinion.

The motion for new trial will be overruled.