## DUPONT ENGINEERING CO. v. NASHVILLE BANNER PUB. CO.

(District Court, M. D. Tennessee. March 9, 1925.)

### No. 1492.

1. **Libel and slander** ⬟89(1)—**Each libel case must stand or fall on its own publication, and courts must determine from publication itself whether it is actionable without averment of special damage.**

Each libel case must stand or fall on its own publication, and the court must determine from publication itself, unaided by extrinsic evidence, whether it is actionable without averment of special damage.

2. **Libel and slander** ⬟9(1)—**Before corporation can maintain libel suit, publication must reflect on management of its business, and be such as is reasonably calculated to cause it pecuniary loss.**

Before a corporation can maintain suit for libel, the publication must reflect on management of its business, and must attack it in method of conducting its affairs, and be such as is reasonably calculated to cause it pecuniary loss.

3. **Libel and slander** ⬟19—**In determining whether publication would lead sensible persons to believe that corporation was guilty of fraud in contract with United States, entire publication must be read, including headlines.**

In determining whether publication alleging corporation had defrauded United States was libelous per se, entire publication, including headlines, must be read to determine whether charges therein would lead sensible persons to believe that corporation had been guilty of fraud.

4. **Libel and slander** ⬟9(1)—**Publication alleging corporation had defrauded United States in contract with it held libelous per se.**

Publication alleging that corporation had been guilty of fraud in contract with United

States, enumerating different transactions, *held* such as to create impression that corporation had by fraud and dishonest practices defrauded the government, and libelous per se.

**5. Libel and slander ☞97—Demurrer to declaration for libel will be sustained only when court can affirmatively say publication is incapable of reasonable construction rendering words defamatory.**

Demurrer to declaration for libel will be sustained only when court can affirmatively say publication was incapable of any reasonable construction which would render words defamatory.

**6. Libel and slander ☞123(2)—It is for judge to say whether unambiguous publication is defamatory; but, where publication was capable of two meanings, jury must say, under all circumstances surrounding publication, whether it was libelous.**

If publication is so unambiguous as to reasonably bear but one interpretation, it is for judge to say whether it is defamatory or not; but if it is capable of two meanings, one of which would render it libelous and the other not, it is for jury, under all circumstances surrounding publication, to say whether it is libelous.

**7. Libel and slander ☞9(1).**

Defamatory words, falsely spoken or written of one, which prejudice him in his business or occupation, are actionable, without proof of special damage.

**8. Libel and slander ☞89(1)—Libel injuriously affecting business or causing pecuniary loss is libelous only under averment of special damages.**

Libel which touches an individual or corporation in its business or trade, and injuriously affects his business, or causes him to suffer pecuniary loss, is libelous only under averment of special damages.

**9. Libel and slander ☞32.**

A corporation which has ceased to do business cannot be injured by statement reflecting on its financial position.

**10. Libel and slander ☞9(1).**

Defamation of corporation, to be actionable per se, must reflect on conduct, management, or financial condition of existing going corporation.

**11. Libel and slander ☞32.**

Corporation cannot be damaged by charges of fraud or mismanagement in a business which it has ceased to do.

**12. Libel and slander ☞9(1).**

Publication alleging fraud of corporation in contract with United States is libelous, notwithstanding that publication was after termination of contract.

**13. Libel and slander ☞89(1)—Declaration for libel, because of publication alleging that corporation was guilty of fraud in contract with United States, must allege that at date of publication corporation was engaged in business.**

Declaration for libel because of publication alleging fraud of corporation in contract with United States must allege that at date of publication corporation was engaged in business, in order that publication be actionable without averment of special damages.

**14. Pleading ☞187.**

Demurrer may be filed in any case to test sufficiency of pleading attacked.

**15. Libel and slander ☞80—Declaration for libel, copied from form in statute, held to sufficiently allege cause of action (Thomp. Shan. Code Tenn. § 4618, and section 4660, subd. 21).**

Declaration for libel, because of publication alleging fraud of corporation in contract with United States, copied from form in Thomp. Shan. Code Tenn. § 4660, subd. 21, *held* to sufficiently allege cause of action, in view of section 4618.

**16. Libel and slander ☞97.**

Plea of privilege as defense matter in action for libel cannot be raised by demurrer.

**17. Libel and slander ☞34.**

It is not publication itself, but occasion of its publication, that makes it privileged.

**18. Libel and slander ☞50.**

Publication in newspaper of false and defamatory matter is not privileged, because made in good faith as matter of news.

**19. Libel and slander ☞48(1)—It is no defense to libel case that publication referred to matters of public interest and concern at time when plaintiff was acting as agency of government in construction and operation of public enterprise.**

It is no defense to libel case that publication refers to matters of public interest or concern occurring at time when plaintiff was acting as agency or instrumentality of government in the construction and operation of public enterprise.

At Law. Action by the Dupont Engineering Company against the Nashville Banner Publishing Company. On demurrer to the declaration. Demurrer overruled in part, and in part sustained, with leave to plaintiff to amend the declaration.

Thos. J. Tyne, Sr., Thos. J. Tyne, Jr., and J. M. Peebles, all of Nashville, Tenn., and W. S. Gregg, of Wilmington, Del., for plaintiff.

E. A. Price and Thomas W. Schlater, Jr., both of Nashville, Tenn., for defendant.

GORE, District Judge. This case for libel is before me on demurrer. The declaration contains one count, and it is averred that plaintiff is a nonresident corporation, "organized and existing," etc., and that the defendant, a resident corporation, is the publisher of a newspaper known as the Nashville Banner; that defendant "falsely and maliciously" published of and concerning plaintiff

certain "false and defamatory matter, with intent to defame the plaintiff," etc.

The publication complained of appeared upon two pages of said paper on the 16th day of December, 1923, and because of its great length a verbatim copy will be pretermitted. The original publication is filed as a portion of the declaration. The demurrer is composed of eight grounds. For convenience the grounds will be grouped—grounds 1 and 2 in one group, grounds 6 and 7 in another group, and grounds 3, 4, 5, and 8 in still another group.

Grounds 1 and 2 are: (1) Because the publication set forth in the declaration is insufficient in law to constitute a cause of action; and (2) because the words set forth in the declaration concerning a corporation are not libelous per se, and therefore not actionable without averment of special damages.

It is true that special damages are not averred in the declaration. Defendant insists that, because plaintiff is a corporation, a mere legal fiction, that the publication is not libelous per se, because it cannot be rendered infamous or odious, or made the object of ridicule or contempt, and same does not injure it in its business, trade, profession, or occupation, or financial or business standing.

Defendant also insists that the publication, when read and construed in the sense in which the readers of the paper would ordinarily understand it, including display lines, if given its natural, necessary, and reasonable construction, does not reflect upon plaintiff, and is therefore not libelous, without averment of special damage. The first and important question to be determined is whether or not the alleged publication is libelous per se, because, if it is not, the first and second grounds of the demurrer should be sustained, and the suit dismissed.

[1] Many opinions from all jurisdictions in the United States, both state and federal, are to be found in the reported cases, but to enumerate them would be tedious and of no avail. From the very nature of things, it is impossible to adopt an accurate and readily applicable definition of written language which is libelous per se. Each case must stand or fall upon its own publication, and the court must determine from the publication itself, unaided by extrinsic evidence, whether or not it is actionable without averment of special damage; but certain rules have been laid down, and they are uniform, for the guidance of courts in such cases.

Newell, in his work on Defamation, Slander, and Libel, at page 181, lays down the rule that, "when language is used concerning a person or his affairs, which from its nature necessarily must, or presumably will, as its natural and proximate consequence, occasion him pecuniary loss, its publication prima facie constitutes a cause of action, and prima facie constitutes a wrong, without any allegation or evidence of damage other than that which is implied or presumed from the fact of publication, and this is all that is meant by the terms actionable per se. Therefore the real practical test by which to determine whether special damage must be alleged and proved, in order to make out a cause of action for defamation, is whether the language is such as necessarily must, or naturally and presumably will, occasion pecuniary damage to the person of whom it is spoken."

And at section 448, in his 3d Edition, under head of "Corporations," Mr. Newell says: "A corporation may sue for any libel upon it, as distinct from a libel upon its individual members. It may also sue for slander upon it in the way of its business or trade." He then quotes from the old English case of South Hetton Coal Co. v. North Eastern News Association, 1 Q. B. 133, an opinion by Lord Esher, to the effect that "the law of libel is the same as to all plaintiffs, and that whether there was a libel or not depends on the same question, namely, whether the jury are of opinion that what has been published with regard to the plaintiff would tend in the minds of ordinary sense to bring plaintiff into contempt, hatred, or ridicule, or to injure his character; the question being the same whether the action be brought by a person, a firm, or a company; that though a corporation may not sue for a libel in respect of anything reflecting upon the members thereof personally, yet they may sue for a libel reflecting on the management of their trade or business, without alleging or proving special damage; that the words complained of must attack the corporation in the method of conducting its affairs, must accuse it of fraud or mismanagement, or must attack its financial position. If, however, the corporation be not engaged in any business, it would probably be necessary to prove special damage in any case of slander, and this would be difficult."

And at section 449, Mr. Newell says: "Incorporated companies, established for the purpose of transacting business, may maintain actions of libel the same as individuals for words affecting their business or property, if special damages are alleged and proved. Shoe & Leather Bank v. Thompson, 18 Abb. Prac. (N. Y.) 413.

In the case of Metropolitan Saloon Omnibus Co. v. Hawkins, 4 H. & N. 87, it is said that "a joint-stock company, incorporated under St. 19 and 20 Vict. c. 47, may sue in its own corporate name for words imputing to it insolvency, dishonesty, and mismanagement of its affairs, and this although the defendant be one of its own shareholders." All the text-writers and reported cases, including reported cases from our own state, adopt the foregoing rule. See, also, Ohio & Mississippi Railway Co. v. Press Publishing Co. (C. C.) 48 F. 206; Bank v. Bowdre Brothers, 92 Tenn. 723, 23 S. W. 131; Fry v. McCord Bros., 95 Tenn. 677, 33 S. W. 568; Memphis Telephone Co. v. Cumberland Telephone & Telegraph Co. (6th Cir.) 145 F. 904, 76 C. C. A. 436; Security Benefit Association v. Daily News Publishing Co. (C. C. A.) 299 F. 445; Culmer v. Canby et al. (6th Cir.) 101 F. 195, 41 C. C. A. 302.

In the case of International Text-Book Co. v. Leader Printing Co. (C. C.) 189 F. 86, it was held by District Judge Killits that "no special damages are alleged, but the law seems to be well settled that, where a libel contains an imputation upon an individual or a corporation in respect to its business, the same becomes libelous per se, and in an action thereon it is not necessary to allege special damages." Ohio & M. Ry. Co. v. Press Publishing Co. (C. C.) 48 F. 206; Victor Safe & Lock Co. v. Deright, 147 F. 211, 77 C. C. A. 437, 8 Ann. Cas. 809; Sternberg Manufacturing Co. v. Miller, etc., Mfg. Co., 170 F. 298, 95 C. C. A. 494; Cooley v. Galon, 109 Tenn., 1; Bank v. Bowdre Bros., 92 Tenn. 723, 23 S. W. 131; Mattson v. Albert, 97 Tenn. 232, 36 S. W. 1090.

Defamatory words, falsely spoken or written of a party, which prejudice such person in his profession, trade, or business, are actionable in themselves, without proof of special damages. Bank v. Bowdre Bros., 92 Tenn. 723, 23 S. W. 131; Mattson v. Albert, 97 Tenn. 232, 36 S. W. 1090; Williams v. McKee, 98 Tenn. 138, 38 S. W. 730; J. B. James Co. v. Bank, 105 Tenn. 1, 58 S. W. 261, 51 L. R. A. 255, 80 Am. St. Rep. 857.
[2] Tested by the foregoing rule, laid down by text-writers and reported cases, is the publication in question libelous per se? Does it reflect upon plaintiff in the management of its business? Or does it injure plaintiff in its business or in a pecuniary way? I repeat, before a corporation can maintain a suit for libel, the publication must reflect upon the management of its business, must attack it in the method of conducting its affairs, must ac-

cuse it of fraud or mismanagement, or of financial inability, and must be such as is reasonably calculated to cause it pecuniary loss.
[3] In determining whether or not the publication in question is libelous per se, one must read the entire publication, including headlines (Commercial Publishing Co. v. Smith [6th Cir.] 149 F. 707, 79 C. C. A. 410; Washington Post v. Chaloner, 250 U. S. 295, 39 S. Ct. 448, 63 L. Ed. 987, and many other cases to the same effect), and, from the whole, say whether or not the charges contained therein would necessarily produce in the minds of sensible persons that plaintiff had been guilty of fraud or misconduct in the management of its business, in its contract with the United States government.

Referring to the publication in question, the first thing the reader would see upon opening the paper would be the sensational headline, reaching entirely across the first page, in large, boldface black type, "McLane Bares Old Hickory Fraud Charges;" next, in large, boldface black type, but not so large, "Claims Government Lost Many Millions," and next follows: "Detailed Figures on Alleged Irregularities Connected with Powder Plant Revealed by District Attorney." And then, throughout the entire publication, is a charge that the government auditors had unearthed "wholesale frauds," "amounting to millions of dollars," and that these charges were made after an "extensive" survey of the records at Old Hickory, "and which covered a period of time extending over several months;" that "after many months of work on the preliminary investigation, during which time the matter was fully presented to the War Transactions Board, the work of investigation has been going on, and additional information and evidence has been obtained by the government for its use in prosecuting the case"; that "District Attorney McLane, who, in presenting the matter to the officials of the Department of Justice, War Department and War Recovery Board, has made no less than 15 trips to Washington, on his return from Washington last week expressed himself as being hopeful that the department would order a full investigation of the matter at an early date. The whole matter is now before the board for their determination, Mr. McLane said."

" * * * The records at Old Hickory had been stored in a building in the old powder area under the orders of Maj. P. J. O'Shaughnesy, formerly connected with the E. I. Dupont de Nemours & Co., Inc., but

more recently with the Ordnance Department of the United States Army;" that "these records had been dumped into tin cans, carried to the temporary storehouse, dumped into rooms, without any regard for system, or as to their importance. The building was one of those which was struck by a cyclone, which swept through Old Hickory last spring, and part of the building was blown away. Some of the records were scattered to the winds. The roof of the building had been torn away, and the records were exposed to the elements for a number of weeks. Other records were found under the flooring of the building, covered with acids."

"The charges of fraud on millions of pounds of cotton and cotton linters, said to have been shipped to the Old Hickory powder plant after December 1, 1918, and even as late as April, 1919, showed exceptions were taken to 13,683,822 pounds, with an approximate value of $832,000. The 13,500,000 pounds excepted to was only a small part of the 82,301,401 pounds shipped, with an approximate value of $44,000,000. The investigation, as made, not only showed that the shipments were made after December 1, 1918, but showed in some instances that the cotton in question had been purchased on requisition and purchase orders for the production and operating of plants other than Old Hickory. The report shows that cotton was bought at one price and sold to the government at a much higher rate, thus breaching the contract of the Dupont Engineering Company, as the contract plainly stated that the contractor should neither gain nor lose by the prices stipulated in the contract."

That "a bale of cotton weighed 2,000 pounds, and in some instances even ran higher, when it is a known fact among cotton shippers that the average bale of cotton weighs approximately 500 pounds." That one car in particular was checked and found that it contained 40 bales of cotton, "weighing 98,749 pounds, while the capacity of the car in which it was shipped was only 88,000 pounds."

From a cursory examination made of freight rates, it was found "that a certain local railroad had at least $29,000 in its hands that was held as overcharges for shipments into the plant. Although these freight claims would have to be investigated, it is the belief of the auditors that at least $1,000,000 could be recovered from overcharges of this nature."

That "from the government report it appears that one of the grossest frauds alleged to have been perpetrated was by a local undertaking establishment which contracted for the care and removal of the bodies of the hundreds of unfortunate victims of the flu epidemic that swept the plant in 1918. The contract alleges that the undertakers were to care for the victims at a price of $75 for each burial. At times when a death would occur, this firm would charge the Dupont Engineering Company the amount under the contract and transfer the body to the potter's field, for which they paid the county authorities $11, thus making a clear profit of the difference."

"When relatives of the deceased were able to pay for the funeral, it is alleged that this firm would charge prices in excess of the contract price. In some cases the relatives would pay $150 for a funeral, and the Dupont Company would pay $300 for the same funeral according to voucher records. Many times valuables belonging to the victims were lost. When shipped to their homes, the victims' bodies in some instances would be shipped nude, and would arrive in a decomposed condition. The Dupont Engineering Company also sent a number of patients to the various local hospitals, some of whom afterwards died and were buried by the local undertaking establishment. Among this number were children from four months old to ten years old, and the United States government paid the bills. At times the parents also paid the bills, but this was not credited to the government."

Many other specific charges of fraud and mismanagement and irregularities are alleged in the publication. It is alleged that "the heavy unloading of stocks, after the signing of the Armistice, is shown in the government report, and involving hundreds of thousands of dollars worth of materials said to have been shipped from allied plants of the Dupont Engineering Company to the Old Hickory powder plant, in order to get rid of these materials at the expense of the government. It is said that carload after carload of various supplies were received at the plant after December 1, 1918, and far into April, 1919. These shipments were all excepted to by the government auditors, who have made an examination of the records."

That the government auditors took exceptions to $75,507.20 of alcohol shipped into the plant after December 1; that exception was also taken to thousands of pounds of nitrate of soda, valued at approximately $8,000,000, shipments being made after December 2, 1918; that this shipment required 38

days of travel by water and rail, "according to the contractors' own statement, they should have cabled cancellation for all these shipments upon the signing of the Armistice. The signing of the Armistice was moral notice to the world, corporations and individuals alike, that the war was at an end, and this point was upheld by the Army Ordnance Department, and instructions were issued to take exceptions to all materials shipped or contracted after December 1, 1918, says the report."

"That a large profit was made by out of town, as well as local firms, on the sale of powder bags to the Dupont Engineering Company, is indicated in the report of the preliminary investigation, and shows that the bags not only were exorbitantly charged for, but were obsolete as containers of powder."

There were a total of 300,035 complete box shooks "left the E. I. Dupont de Nemours plant at Wilmington, Delaware, on November 25, two weeks after the signing of the Armistice, and arrived at the plant after December 1, at a cost of approximately $50,000, exclusive of freight. There were no vouchers in the plant files covering these shipments. The auditors viewed this as an unloading of surplus stocks onto the Old Hickory Plant." It is estimated that "$3,000,000, of claims for gifts, unlawful legal expenses, losses on account of criminal acts of contractor's employees, incidental expenses of a purely personal nature, claims for personal expenses over and above a reasonable charge, and other items in detail, should be disallowed as being impossible of acceptance as a charge properly applicable to the contract."

"Charges that duplicate vouchers were being issued are based on the discovery of one car of steel, valued at $15,105.82 for which invoices were rendered, giving the car number and numbers of waybills, which seven days later was alleged to have been received at the plant. Both of these shipments were paid for. Both shipments were from the same point of origin, both in the same car, and the weights were identical. It is inconceivable, according to the auditor, that a steel company could make two identical shipments in the space of seven days, and have shipped the steel in the same car from a distant point. The auditor stated that he believed it was impossible to have returned the car from the plant to the point of origin, and shipped it back to the plant within a week. Millions of dollars, he said, might be recovered upon an investigation by the government." "Large bonuses were found to have been paid to employees, and many of them were overpaid. One voucher alone for a bonus amounted to $250,000." "A number of items properly chargeable to operation were improperly charged to construction, thus making the construction cost high and the operation cost low."

[4] It is obvious to my mind that the publication in question could have no other effect than to create the impression that the plaintiff had by fraud, stealth, unfair and dishonest practices defrauded the government out of millions of dollars by means of overcharges, duplicate vouchers, payment of exorbitant bonuses, falsifying the records, and then sought to destroy the evidence of its guilt by the destruction of the files kept by it at the plant, and the fair inference would be that plaintiff had entered into a conspiracy with the E. I. Dupont de Nemours & Co., whereby the latter had unloaded its surplus stock of antiquated and nonusable material at an exorbitant price upon the government, and, worst of all, it had been shockingly inhuman in the burial of the dead bodies of its employees, who were the victims of the ravages of disease, while working for plaintiff at the powder plant, and it had reaped an unholy profit off of the government in this particular.

[5] Another court might construe the language differently, but, even if it is subject to a different construction, no course is left open to me, except to overrule the first and second grounds of the demurrer, and submit the question of the actionability of the publication to a jury with proper instructions. A demurrer "will only be sustained where the court can affirmatively say that the publication is incapable of any reasonable construction which will render the words defamatory." 25 Cyc. p. 468. "If the publication complained of in an action for libel, giving to the language its ordinary and usual meaning, is actionable without averment of special damage, the petition will not be demurrable on the ground that it does not state a cause of action. * * *" Culmer v. Canby et al. (6th Cir.) 101 F. 195, 41 C. C. A. 302.

[6] If the publication is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether it is defamatory or not; but if it is capable of two meanings, one of which would render it actionable and libelous, and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those by whom it might be read. Commercial Publishing Co. v. Smith (6th Cir.) 149 F. 704, 79 C. C. A. 410; Security Benefit Ass'n.

v. Daily News Publishing Co. (C. C. A.) (8th Cir.) 299 F. 445; Publishing Co. v. Gamble, 115 Tenn. 663, 90 S. W. 1005; Washington Post Co. v. Chaloner, 250 U. S. 290, 39 S. Ct. 448, 63 L. Ed. 987; International Textbook Co. v. Leader Publishing Co. (C. C.) (6th Cir.) 189 F. 86; Bank v. Bowdre Bros., 92 Tenn. 722, 23 S. W. 131; Banner Publishing Co. v. State, 16 Lea, 175, 57 Am. Rep. 216; Fry v. McCord Brothers, 95 Tenn. 667, 33 S. W. 568; Mattson v. Albert, 97 Tenn. 232, 36 S. W. 1090; Railroad v. Delaney, 102 Tenn. 289, 52 S. W. 151, 45 L. R. A. 600. And many other cases might be cited to the same effect.

[7] Counsel have cited me to numerous cases, both pro and con, upon this question, but I deem it unnecessary to refer to all of them, because "it is well settled in this state that defamatory words, falsely spoken or written of one, which prejudice him in his business or occupation, are actionable without proof of special damage." Cooley v. Galyon, 109 Tenn. 1, 70 S. W. 607, 60 L. R. A. 139, 97 Am. St. Rep. 823, and cases cited. The leading case of libel in Tennessee, and the one which has been referred to and approved by all subsequent cases, is that of Bank v. Bowdre Bros., 92 Tenn. 722, 23 S. W. 131. That case was brought by a firm of merchants, doing business under the firm name of Bowdre Brothers & Company, and what was said by the court in that case applied to natural and not to artificial persons. But since words which are libelous when spoken of a natural person will also be libelous when spoken of an artificial person, provided same reflect upon the credit or management of the business of the corporation, and injure it in a pecuniary manner, I think the rule laid down in this case is applicable to the case at issue.

In that case it was held that "defamatory words, falsely spoken of a party, which prejudice such party in his profession or trade or business, are actionable in themselves, without proof of special damages;" and the court quotes with approval Newell, Defamation, Slander and Libel: "That the courts no longer strain to find an innocent meaning for words prima facie defamatory, neither will they place a forced construction on words which may fairly be deemed harmless. The rule which once prevailed, that words are to be understood in mitiori sensu, has been long ago superseded, and words are now to be construed by courts as they always should have been—in the plain and popular sense in which the rest of the world naturally understood them." The following was also cited

with approval, from Newbold & Sons v. J. M. Bradstreet & Son, 57 Md. 38, 40 Am. Rep. 426: "To say or publish of a merchant anything that imputes insolvency, inability to pay his debts, want of integrity in his business, or personal incapacity, or pecuniary inability to conduct it with success, is slanderous or libelous per se, if without justification, and general damages may be recovered."

"Before a demurrer can be sustained to a petition counting on an alleged libelous publication, it must appear that the publication is not reasonably capable of a defamatory meaning, and cannot reasonably be understood in a defamatory sense. If an inspection of the publication convinces the court that no such reasonable construction of the language used could give to it a defamatory sense and meaning, a demurrer should be sustained; otherwise, its meaning and interpretation must be left to the jury, under proper instructions as to what constitutes libel." Culmer v. Canby, 101 F. 196, 197, 41 C. C. A. 302, 304; Sanderson v. Caldwell, 45 N. Y. 398, 6 Am. Rep. 105; State v. Smily, 37 Ohio St. 34, 41 Am. Rep. 487, and many other cases.

It cannot reasonably be insisted that the publication in question, when construed in connection with its headlines, would not tend to prejudice the minds of persons reading it against the plaintiff; that it did not seriously reflect upon the conduct of plaintiff in the management and conduct of its business with regard to its contract with the United States to construct and operate the Old Hickory Powder Plant, or that it would not tend to lessen plaintiff in the estimation of the business world, and thereby affect its business standing, resulting in pecuniary loss. Grounds 1 and 2 of the demurrer should be overruled.

Grounds 6 and 7 will be next considered: Ground No. 6, because the declaration does not aver that at the date of said alleged libelous publication plaintiff was still engaged in said special business of constructing and operating said powder plant for the United States government, and therefore said publication is not actionable without averment of special damages; ground No. 7, because the declaration does not aver that plaintiff was at the date of said publication engaged in that or any other business, and therefore said publication is not actionable without averment of special damage.

It is insisted by counsel for defendant that, even if the publication complained of was libelous per se, plaintiff cannot recover, and the suit should be dismissed under these

two grounds of demurrer, because it is not alleged that the publication was made while plaintiff was engaged in the particular business of constructing and operating the powder plant at Old Hickory, or was not engaged in some kind of business at that time.

[8] In disposing of these grounds of demurrer, it is necessary to remember that libels group themselves into two classes—in one class is that character of libel which touches an individual in his life or liberty, or excludes him from the benefits of society, and makes him the object of ridicule; while the other is that class of libel which touches an individual (or corporation) in his business or trade, and which injuriously affects his business or causes him to suffer pecuniary loss. In the latter case, one would only be libelous under averment of special damages. If he has no business, he cannot be injuriously affected therein.

In 25 Cyc. p. 329, it is stated: "Slanderous imputations, to be actionable within the foregoing rule, must be published while the party is still engaged in such business or profession. But a libel, although published even after the party has ceased to engage in such business or profession, may still be actionable, as tending to disgrace and degrade." The last sentence in this quotation refers to a natural person, as "tending to disgrace and degrade." This cannot apply to an artificial person, because it is not susceptible of ridicule or contempt. But the first sentence in the quotation, "Slanderous words, to be actionable within the foregoing rule, must be published while the party is still engaged in such business or profession," applies to an artificial as well as a natural person, because it relates to an injury to the person (or corporation) in his business or occupation.

The rule as stated in Corpus Juris, vol. 36, p. 1182, is: "Words spoken of a person to be actionable within the foregoing rules must be spoken while he is engaged in such business or profession, or in such office or employment. The same rule has been applied in case of libel as to business and profession. But it has also been held that a libel, although published even after the party has ceased to engage in such business or profession, may still be actionable as tending to disgrace and degrade, and that to be libelous it is sufficient that the words tend to expose the character of plaintiff to ridicule or contempt, and to degrade him in the estimation of the community, although his term of office or employment had expired at the time of the publication." This clearly differentiates between

a natural person and a corporation. It shows that a person may be libeled by defamatory words spoken of him in his business, profession, or office, after he has ceased to engage in such business or profession, and after he has retired from such office, upon the ground that "it is sufficient that the words tend to expose the character of plaintiff to ridicule or contempt, and to degrade him in the estimation of the community." As has been seen above, a corporation cannot be held up to ridicule or contempt, and it cannot be degraded in the estimation of the community, because it is not susceptible of social standing, but to be actionable against a corporation the words must be spoken "while it is engaged in such business or profession."

Townshend on Slander and Libel, § 263, says: "Language concerning a corporation not engaged in any business can hardly occasion, and certainly does not necessarily occasion, it any pecuniary injury; therefore, in regard to language concerning such a corporation, no action can be maintained, except upon proof of special damage; but as regards a corporation engaged in manufacturing, trading or banking, or other occupation in which credit may be material to its success, there language concerning such a corporation, calculated to injuriously affect its credit, must necessarily occasion it pecuniary injury; and in such a case an action may be maintained by the corporation without proof of any special damage. Thus, as regards language concerning corporations, some is actionable per se, and some is actionable only by reason of special damage."

[9, 10] Counsel for plaintiff cite a number of decisions and text-books upon the subject, but all of them refer to cases wherein plaintiff was a natural person, and therefore could be held up to scorn or contempt, and while the defamatory words may have been spoken of them, in connection with their business which they had previously conducted, or offices which they had previously held, still there was that element of personal damage which does not apply to a corporation. They cite me also to cases where the corporation was doing business at the date of the publication. In these latter cases it will be noticed that the publication complained of reflected upon plaintiffs' *then* business, trade, or profession. Illustrations:

South Hetton Coal Company Case, 1 Q. B. 133: " * * * With regard to a firm or company, it is impossible to lay down an exhaustive rule as to what would be a libel on them. But the same rule is applicable to

a statement made in regard to them. Statements may be made with regard to their mode of carrying on business, such as to lead people of ordinary sense to the opinion that they conduct their business badly and inefficiently; if so, the law will be the same in their case as in that of an individual, and the statement would be libelous." "The words complained of must attack the corporation or company in the method of conducting its affairs, must accuse it of fraud or mismanagement, or must attack its financial position." Note: "Statements may be made with regard to their mode of carrying on business;" not of the mode in which they *carried* on business. "Such as to lead people of ordinary sense to the opinion that they conduct their business badly and inefficiently;" not, that they *formerly conducted* their business badly and inefficiently. "The words complained of must attack the corporation or company in the method of conducting its affairs, must accuse it of *fraud* or mismanagement, or must attack its financial position;" not, that the words complained of attack the corporation in the method it *formerly conducted* its affairs. A corporation which has ceased to do business cannot be injured by a statement reflecting on its financial position. The entire opinion bears out the idea that the defamation of a corporation, to be actionable per se, must reflect upon the conduct, management, or financial condition of an existing going corporation (business), which is subject to injury in its business.

The case of Sternberg Mfg. Co. v. Miller, Du Brul & Peters Mfg. Co. (C. C. A. 8th Cir.) 170 F. 298, 95 C. C. A. 494, 18 Ann. Cas. 69, cited by counsel for plaintiff, is another case where the defendant was actually engaged in business, and it charged the plaintiff with "peculiar misconduct, which naturally and directly brings down upon the offender's business the disapprobation of the public and necessarily entails injurious consequences."

The case of Axton-Fisher Tobacco Co. v. Evening Post Co. et al., 169 Ky. 64, 183 S. W. 269, L. R. A. 1916E, 667, Ann. Cas. 1918B, 560, was an action for libel instituted by a corporation against the defendant, the publisher of a newspaper in the city of Louisville. In the opinion of the Court of Appeals it will be seen that this plaintiff corporation was a "going concern," and the publication was "of such a nature as to deprive it of the patronage or trade it enjoyed in a business way, or to render it so odious and contemptible in the estimation of those with whom it did have or might reasonably expect to have business dealings or connections as to injuriously affect its business."

The case of Sharpe v. Larson, 67 Minn. 428, 70 N. W. 1, 554, was an action for libel growing out of the publication in a local newspaper of a lengthy article which reflected upon the plaintiff, who had previously been county attorney, and dealt with certain matters during the time when he was county attorney; but the publication was after he had ceased to hold such office. In that case it was held: "It is not necessary that the person libeled should at the time of the publication still hold the office." The facts of this case are not applicable to the one at bar, because the plaintiff was a natural person, and had social standing which would be injured by the publication. He was subject to be brought into ridicule and contempt, and, while I have not been able to read the opinion, still I can understand why he could have been damaged by the defamatory publication. [11] Plaintiffs cite me to a number of other cases, but, as stated above, all of them are cases of individuals suing for libel after they have retired from office, or of corporations which are actually engaged in business, and are not apropos to the case at bar. It is clear that the language complained of must refer to a business in which the corporation was then engaged; otherwise, it cannot be damaged by charges of fraud or mismanagement in a business which it has ceased to do. Unlike natural persons, its financial condition is not material unless it is engaged in business. In the South Hetton Coal Co. Case, supra (3d Ed. of Newell, Slander and Libel), at page 436, it is said: "If, however, the corporation be not engaged in any business, it would probably be necessary to prove special damage, in any case of slander, and this would be difficult."

Counsel for plaintiff in their brief cite Newell, Slander and Libel (3d Ed.) § 42, p. 75, which deals with libel of one holding an office, the last sentence of which is: " * * * And it is not necessary, as it is in cases of slander, that the person libeled should at the time still hold that office or exercise that profession; it is actionable to impute past misconduct when in office." This is another case where the writer was speaking of a natural person, and in my judgment, comes under the rule set out in Corpus Juris and Cyc., cited above, and does not apply to a corporation.

Newell, Slander and Libel (4th Ed.) § 134, quotes with approval Nelson, Chief Justice, in the case of Cramer v. Riggs, 17 Wend. (N. Y.) 209, 210, as follows: " * * * The plaintiff here is not under the necessity

of relying upon his official character for the purpose of maintaining the action; it is not the effect upon it of which he complains, or upon which the suit is predicated; it is the effect of the imputation of previous misconduct, official or otherwise, upon his private character at the time of the publication, that constitutes the ground of complaint— holding him up as an individual who had been guilty of corruption in office, and hence capable of like conduct if again trusted, thereby invoking upon him the odium and scorn of the public." He then proceeds: "The law is the same in Canada under the imperial decisions. Thus, where an action is brought for words spoken of a lawyer or a physician, it must appear that he practiced as such at the time the words were spoken, for otherwise the words could not have affected him professionally. So, if an action be brought for publishing words of a tradesman concerning his trade, it must be averred at the time of publishing them he was in trade, for, if he were not at that time in trade, his credit could not be injured by the words. The cases all admit this principle, and show that, for slander of a man in his calling, that calling, whatever it might be, had continued, either actually or by intendment, to the time of the speaking of the words; and where one had intended to pursue a line of business, but was deterred therefrom by misrepresentations of another, such misrepresentations were not actionable."

In England a distinction even is made between defamation of a person in an office of profit and an office of honor, Newell, Slander and Libel (4th Ed.) § 134. This principle is recognized in the leading case upon libel in Tennessee, in the case of Bank v. Bowdre Bros., 92 Tenn. 722, 23 S. W. 131, wherein the court quotes with approval Newell, Defamation, Slander, and Libel, § 168, as follows: " 'It by no means follows,' says the same author, 'that all words spoken to the disparagement of an officer, professional man, or trader will be actionable in themselves. Words, to be actionable on this ground, must touch the party in his office, profession, or trade; that is, they must be shown to have been spoken of him in relation thereto, and to be such as would prejudice him therein.' " And in the same opinion the court quotes from Sanderson v. Caldwell, 45 N. Y. 405, 6 Am. Rep. 105, as follows: "There is some confusion in the cases upon the point whether the words used must in terms be applied by the speaker to the office, business, or profession of the person who claims to recover by reason of them, and whether, if not so expressly applied, they can be said to touch

him in the special character named. The rule derived from the authorities, and with which most of the cases can be reconciled, seems to be this: When the words spoken have such a relation to the profession or occupation of the plaintiff that they directly tend to injure him in respect to it, or to impair confidence in his character or ability, when, from the nature of the business, great confidence must necessarily be reposed, they are actionable, although not applied by the speaker to the profession or occupation of the plaintiff; but when they convey only a general imputation upon his character, equally injurious to any one of whom they might be spoken, they are not actionable, unless such application be made." " * * * It has likewise been held that a publication that a party 'owes a debt,' without more, is not of itself sufficient to make the publication libelous (especially when such person is not engaged in business). * * * " Fry v. McCord Bros., 95 Tenn. 686, 33 S. W. 568; Zier v. Hofflin, 33 Minn. 66, 21 N. W. 862, 53 Am. Rep. 9; Odgers on Slander and Libel, 81; Newell, Defamation, § 37, p. 195. Many other cases might be cited to the same effect, but I deem it unnecessary to do so.

It is no argument that plaintiff was "organized and existing" as a corporation at the time of the publication of the libelous article, because we know, from personal experience and reported cases, that a corporation sometimes continues to exist long after it ceases to function, and long after it ceases to exercise its franchise or engage in business. The leading case upon this question in Tennessee is Parker v. Bethel Hotel, 96 Tenn. (12 Pickle) 251, 34 S. W. 209, 31 L. R. A. 706, wherein the court uses the following language: "The dissolution of a business corporation is effected in one of the following ways: (1) By the expiration of its charter; (2) by act of the Legislature, where power is reserved for that purpose, or there is no constitutional inhibition; (3) by surrender of charter which is accepted; (4) by forfeiture of the franchises and judgment of dissolution, pronounced by a court having jurisdiction. 2 Morawetz, § 1004; Taylor on Private Corporations, § 430. It is not pretended that the Bethel Hotel Company was dissolved in either of the ways indicated. The charter of the corporation has not expired, neither has it been repealed by the Legislature, or been surrendered to the state by its members or stockholders. It may be true that there was a nonuser of its franchises by the corporation for a period of seven years or more, occasioned by the sale of the only property it owned which

could have been used for hotel purposes.. Undoubtedly the nonuser of its franchises by a corporation is ground for dissolution and forfeiture of its charter, at the insistence of the state; but until sentence of dissolution has been pronounced by a court of competent jurisdiction, in a proper proceeding instituted for the purpose, the corporation will continue to exist, notwithstanding its failure to use its franchises. And forfeiture can only be decreed in a proceeding directly instituted for the purpose, by the state granting it. M. & V. Code, § 1712; State v. Butler, 15 Lea [Tenn.] 104, 110; Jersey City Gaslight Co. v. Consumers' Gas Co., 40 N. J. Eq. 427 [2 A. 922]; Broadwell v. Merritt, 87 Mo. 95. Until dissolution has been thus judicially pronounced, neither the existence of the corporation or its title to its property can be questioned collaterally." "We are bound to conclude, therefore, that the Bethel Hotel Company was not dissolved, or its franchises extinguished, for any of the reasons alleged by the defendants, and that it is now a corporation endued with life, with authority to own property and exercise all the powers conferred on it by its charter."

[12] It is true that the publication complained of concerns matters growing out of a contract between the Dupont Engineering Company and the United States government for the construction and operation of the Old Hickory powder plant as a war enterprise for the latter. But I am unable to agree with counsel for defendant that defendant would not be liable for false and defamatory matters published of plaintiff in connection with its contract with the United States government, after the termination of its contract; e. g., A., a construction corporation, builds a house for B., and makes a contract to build a house for C., and while thus engaged D. publishes a false statement pertaining to A.'s conduct in the management of its affairs in building the house for B., which is slanderous and injurious, and calculated to result in depriving it of other contracts, thereby causing it pecuniary loss. It certainly would have a right to maintain an action against D., although it had executed the contract with B. at the date of the publication of the defamatory statement. Any other rule would be harsh and unreasonable, and therefore I do not agree with counsel for defendant that this action cannot be maintained in the absence of an averment that plaintiff was, at the date of the publication of the alleged libelous article, engaged in the construction and operation of the Old Hickory powder plant.

[13] It results that ground 6 of the demurrer will be overruled, and ground 7 will be sustained.

The third, fourth, fifth, and eighth grounds of demurrer:

Third. Because the publication complained of shows upon its face that it is about a matter of public interest and concern, and of which the public should be apprised, and which it was the right and duty of the defendant, a newspaper or public journal, to publish, and therefore the defendant was within its rights of qualified privilege in publishing the same.

Fourth. Because said publication shows upon its face that it deals with matters involved in the proceedings and hearings of the subcommittee on ordnance of the War Transaction Board, a tribunal or agency of the United States government constituted and authorized by law to conduct and hold said proceedings, which were a matter of public interest and concern, and the said proceedings were privileged, and that the defendant in publishing same was within its right of qualified privilege as a newspaper or public journal.

Fifth. Because said publication shows upon its face that it is based on the statement of the United States district attorney, and public records of the United States government, given out and made public by said United States district attorney, the duly authorized and acting legal representative of the United States government, in charge and control of the matters embraced in the publication complained of, and the defendant, in making said publication, which was about matters of public interest and concern, was within its right of qualified privilege of a newspaper or public journal.

Eighth. Because said publication complained of shows upon its face that the plaintiff, Dupont Engineering Company, in constructing and operating said powder plant at Old Hickory, was, in so doing, acting for the United States government, and as an agency, instrumentality, or arm of said government, in the public work or business of said government, in the manufacture and production of powder, and defendant, in making said publication, which was about matters of public interest and concern, was within its right of privilege or qualified privilege as a newspaper or public journal.

The principal question to be considered under these grounds of demurrer is one of pleading. Counsel for defendant insist that the question of privilege is one of law, and is proper to be raised by demurrer; while coun-

sel for plaintiff insist that the question of privilege cannot be raised by demurrer.

[14] A demurrer may be filed in any case. It tests the sufficiency of the pleading attacked. The demurrer in this case attacks the declaration as being insufficient in law, because it says, "Defendant was within its right of qualified privilege as a newspaper or public journal" in publishing the article complained of, and that the allegations in the declaration do not allege a cause of action; that the averment in the declaration that the statements in the publication were "false and malicious," and made "with intent to defame the plaintiff," are insufficient in law to charge actual malice in fact.

[15] I cannot concur in this opinion for obvious reasons. The declaration is copied from the form set out in Thompson's Shannon's Code of Tennessee, § 4660, subd. 21. Section 4618 of said Code, under title of "Pleadings in Civil Actions," is: "It is sufficient to state in the declaration in slander or libel that the defendant falsely and maliciously charged the plaintiff with perjury, larceny, or other crime, as the case may be, in substance as follows, setting it out."

A declaration similar to the one in issue was held good in the libel case of Warner v. Railway Co. (C. C.) 112 F. 114, decided by Circuit Judge Hammond, which was a Tennessee case, and the question there involved was the sufficiency of the declaration to charge malice under section 4660 of the Code, supra—the court citing 13 Enc. Pl. & Pr. 39; Pursell v. Archer, Peck (Tenn.) 317; Bank v. Bowdre, 92 Tenn. 740, 23 S. W. 131; Banner Pub. Co. v. State, 16 Lea (Tenn.) 176, 57 Am. Rep. 216; Le Fanu v. Malcomson, 1 H. L. Cas. 636. The court then proceeds:

"These authorities show that, like malice, publication and the identity of the plaintiffs are questions for the jury, and not for the court on demurrer. It seems quite impossible, on the authorities, to defend a libel suit by demurrer, since so much is left to be developed only by the proof at the trial."

In Ohio & M. Railway v. Press Publishing Co. (C. C.) 48 F. 206, the declaration averred: " * * * That the statement was 'false, * * * malicious, and made for the purpose of injuring the credit and business of the plaintiff,' " and this was held to aver a cause of action, and the demurrer was overruled as frivolous.

In White v. Nicholls, 3 How. 266, 11 L. Ed. 591, the declaration charged the defendant with "maliciously and wickedly intending to injure the plaintiff in his character, and

thereby to effect his removal from office, and the appointment of one of the defendants in his stead, and, with that view, with having falsely, wickedly, and maliciously composed and published, and having caused to be composed and published, a false, malicious, and defamatory libel concerning the plaintiff, both as a citizen and an officer," was held good. In passing upon the question the court say: "Before proceeding more particularly to consider the rulings of the court upon these instructions, it may be proper to animadvert upon a point of pleading which was incidentally raised in the argument for the defendants in error, which point was this: That, assuming the publication declared on as a libel to be one which would be prima facie privileged, the circumstances which would render it illegal—in other words, the malice which prompted it—must be expressly averred. Upon this point the court will observe, in the first place, that in cases like the one supposed in argument they hold that, in describing the act complained of, the word 'maliciously' is not indispensable to characterize it; they think that the law is satisfied with words of equivalent power and import; thus, for instance, the word 'falsely' has been held to be sufficiently expressive of a malicious intent, as will be seen in the authorities cited 2 Saund. 242a (note 2). But the declaration in each of these cases charges the defendants, in terms, with maliciously and wickedly intending to injure the plaintiff in his character, and thereby to effect his removal from office, and the appointment of one of the defendants in his stead, and, with that view, with having falsely, wickedly, and maliciously composed and published, and having caused to be composed and published, a false, malicious, and defamatory libel concerning the plaintiff, both as a citizen and an officer. The averments in these declarations appear to the court, in point of fact, to be fully up to the requirement insisted on, and to leave no room for the criticism attempted with respect to them. * * *"

[16] In an action for libel the plea of privilege is defense matter, which cannot be raised by demurrer. Robinson v. Coulter et al., 215 Mass. 566, 102 N. E. 938; Riley et al. v. Evening Post Publishing Co., 30 Cal. App. 294, 158 P. 225. The question of privilege is one of fact, depending upon the occasion of the publication, as well as the bona fides, and is an exception, and the only effect is to change the rule of evidence. Where the defendant shows that the publication was qualifiedly privileged, it then becomes incumbent

on the plaintiff to show malice. "The jury being the tribunal to determine whether malice did or did not mark the publication, the alleged libel should be submitted to them." White v. Nicholls, supra; Mattson v. Albert, 97 Tenn. 232, 36 S. W. 1090; Banner Pub. Co. v. State, 16 Lea (Tenn.) 175, 57 Am. Rep. 216. "Good faith of the publication is for the jury." National Cash Register Co. v. Salling, 173 F. 22, 97 C. C. A. 334; Lea v. White, 4 Sneed, 113. Mr. Townshend, in his work on Libel and Slander, at page 298, says: "The proper meaning of a privileged communication is that the occasion on which it ·was made rebuts the inference arising prima facie from a statement prejudicial to the character of the plaintiff, and puts it upon him to prove that there was malice in fact, and the defendant was actuated by motives of personal spite and ill will, independent of the circumstances in which the communication was, made." Newell, Slander and Libel (3d Ed.) p. 481, says: " * * * Where the communication is entitled to the privilege, the burden of proof is then upon the plaintiff to show actual malice in the sense of oblique design or bad faith." It is impossible to introduce this proof upon demurrer. The · only way in which it can be done is upon a trial before a jury, upon proper pleading.

In the case of White v. Nicholls, supra, which case has been followed ever since its publication, it is said: "Privileged communications are an exception; and the rule of evidence, as to such cases, is so far changed as to require of the plaintiff to bring home to the defendant the existence of malice as the true motive of his conduct." "The burden of proving the privilege claimed lies upon the defendant." National Cash Register Co. v. Salling, 173 F. 26, 97 C. C. A. 334; 18 Am. & Eng. Enc. of Law, 1031; Schomberg v. Walker, 132 Cal. 224 [64 P. 290]; King v. Patterson, 49 N. J. Law, 417, 9 A. 705, 60 Am. Rep. 622; Ritchie v. Widdemer, 59 N. J. Law, 290, 35 A. 825; Newell on Libel and Slander, §§ 71, 72. · "The defense of privilege must be pleaded." Publishing Co. v. Maloney, 50 Ohio St. 71, 33 N. E. 921; Hallam v. Post Pub. Co. (C. C.) 55 F. 463; Riley et al. v. Evening Post Publ. Co., 30 Cal. App. 294, 158 P. 225. Good faith of the publisher is for the jury. National Cash Register Co. v. Salling (9th Cir.) 173 F. 22, 97 C. C. A. 334; Seely v. Blair, Wright (Ohio) 358; Hallam v. Post Pub. Co. (C. C.) 55 F. 463. "The question of malice is to be submitted to the jury on the face· of the publication ·itself. * * *" "The mere recita-

tion in the introduction that it was a proceeding in court does not make it so." Saunders v. Baxter, 6 Heisk. (Tenn.) 380; White v. Nicholls, 3 How. 291.

25 Cyc. page 405: "Defamatory matter, published in good faith in the honest belief in its truth, if false, is not privileged because published as a mere matter of news." And on page 406: "The Constitution of the United States and the state Constitutions guarantee the right of freedom of speech and liberty of the press. The term 'freedom of the press' consists in a right, in the conductor of a newspaper, to print what he chooses, without any previous license, but subject to be responsible therefor to the same extent that any one else would be responsible for the publication." "Whatever a man publishes, he publishes at his peril." The King v. Woodfall, Lofft. 776, 781; Hearne v. Stowell, 12 A. & E. 719, 726; Shepheard v. Whitaker, L. R. 10 C. P. 502; Clark v. North American Co., 203 Pa. 346, 351, 352, 53 A. 237; Peck v. Tribune Co., 214 U. S. 189, 29 S. Ct. 554, 53 L. Ed. 960, 16 Ann. Cas. 1075; Washington Post Co. v. Chaloner, 250 U. S. 293, 39 S. Ct. 448, 63 L. Ed. 987; Morasse v. Brochu, 151 Mass. 567, 25 N. E. 74, 8 L. R. A. 524, 21 Am. St. Rep. 474.

[17] It is not the publication, but the occasion of its publication, which is privileged. It is plain to be seen there are occasions upon which one person may make a hurtful statement of another, without incurring liability. If one has a right to make a statement, whether that statement be injurious or not, then the occasion makes the statement privileged, and no liability ensues. Lea v. White, 4 Sneed (Tenn.) 113; 1 Stark. on Slander, 403, 404. But a person can never escape liability for making an untrue defamatory statement of another, with malice and without probable cause. The privilege is often conditional upon the publication being made bona fide, without malice, upon probable cause, and proper occasion. Such statements are not "full privilege," or "absolute privilege," and if there is bad· faith and malice, and the occasion does not call for the · communication, liability ensues. White v. Nicholls, 3 How. 287, 11 L. Ed. 591; Southern Ice Co. v. Black, 9 Thomp. (Tenn.) 400; Banner Publishing Co. v. State, 16 Lea (Tenn.) 182, 57 Am. Rep. 216; Mattson v. Albert, 97 Tenn. 233, 36 S. W. 1090; Ruohs v. Backer, 6 Heisk. (Tenn.) 397, 19 Am. Rep. 598; Saunders v. Baxter, 6 Heisk. (Tenn.) 370; Byam v. Collins, 111 N. Y. 143, 19 N. E. 75, 2 L. R. A. 130, and note, 7 Am. St.

Rep. 726; Allen v. Pioneer Press, 40 Minn. 117, 41 N. W. 936, 3 L. R. A. 532, 12 Am. St. Rep. 707; Peck v. Tribune, supra; Morasse v. Brochu, 151 Mass. 567, 25 N. E. 74, 8 L. R. A. 524, 21 Am. St. Rep. 474; 25 Cyc. p. 375. But in cases of publications made bona fide, without malice, upon probable cause, and upon proper occasion for its publication, even if it be false, still it would be "qualifiedly" privileged, and no liability will ensue.

"But the tendency of the law, at present, is to narrow the right of absolute privilege, and to make all such communications conditionally privileged, but with varying conditions, according to the exigencies of the case." Banner Pub. Co. v. State, 16 Lea (Tenn.) 183; Ruohs v. Backer, 6 Heisk. (Tenn.) 397; Saunders v. Baxter, 6 Heisk. (Tenn.) 370; Byam v. Collins, 111 N. Y. 143, 19 N. E. 75, 2 L. R. A. 130, 7 Am. St. Rep. 726; Allen v. Pioneer Press, 40 Minn. 117, 41 N. W. 936, 3 L. R. A. 532, 12 Am. St. Rep. 707.

The Constitutions provide:

Tennessee (article 1, § 19): "That the printing presses shall be free to every person to examine the proceedings of the Legislature; or of any branch or officer of the government, and no law shall ever be made to restrain the right thereof;" that "the free communication of thoughts and opinions is one of the invaluable rights of men, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

United States (amend. art. 1): "Congress shall make no law * * * abridging the freedom of speech or of the press. * * * "

It is the privilege, if not the duty, of the press, as a disseminator of news, to publish matters of public interest; still it is not immune from liability for defamatory publications. But, when a publication concerning matters of vital importance to every one is made in good faith, in the bona fide belief of its truth, and without malice, purporting to be an interview of so high an officer of the government as the district attorney, and when same is free from comment by the publisher (except the headlines), I am of opinion that the occasion on, and the circumstances under, which same was published, classifies it as "qualifiedly privileged," which, according to well-established law, upon a trial, will rebut the presumption of malice, and cast the burden of proving actual malice upon plaintiff. But if, upon the trial, it should appear from the proof that the publication was false and malicious, that it was not made in good faith, and was made without probable cause, then the defense of privilege would be overcome, and plaintiff should recover the damages sustained.

[18] "The publication in a newspaper of false and defamatory matter is not privileged, because made in good faith as a matter of news. The right to publish through the newspaper press such matters of interest as may be thus properly laid before the public does not go to the extent of allowing the publication concerning a person of false and defamatory matter, there being no other reason or justification for so doing than merely the purpose of publishing the news." Newell, Slander and Libel, p. 184; Mallory v. Pioneer Press Co., 34 Minn. 521, 26 N. W. 904; Sheckell v. Jackson, 10 Cush. (Mass.) 25; Detroit Daily Post Co. v. McArthur, 16 Mich. 447; Perret v. New Orleans Times Newspaper, 25 La. Ann. 170; Smart v. Blanchard, 42 N. H. 137.

[19] It is no defense that the publication refers to matters of public interest and concern, occurring at a time when plaintiff was acting as an agency or instrumentality of the government in the construction and operation of a public enterprise. Even if it were, it did not lay itself open to false, malicious, defamatory libel, and the doors of the courts are not closed to it in cases where it is maligned and injured by the publication of false and malicious charges, either by a citizen or the public press.

These grounds of demurrer will, therefore, be overruled. An order will be entered, overruling grounds Nos. 1, 2, 3, 4, 5, 6, and 8 of the demurrer, and sustaining ground No. 7 of same. If plaintiff desires to amend the declaration, so as to comply with the rulings of the court upon ground No. 7, it may do so, and in that event the demurrer will be overruled in toto; otherwise, the suit will be dismissed, at the cost of plaintiff.